**Aldo Biagi, Appellee, v. Grace R. Gregory, Appellant.**

Gen. No. 47,123.

First District, First Division.
December 8, 1958.
Rehearing denied January 23, 1959.
Released for publication January 23, 1959.

Hugh M. Matchett, of Chicago, for appellant.

Andalman & Andalman, of Chicago (Maxwell N. Andalman and Bernard W. Vinissky, of counsel) for appellee.

JUSTICE ROBSON delivered the opinion of the court.

This appeal involves a complaint in equity by plaintiff for a partnership accounting and a countercomplaint by defendant that the partnership be dissolved

on the ground of fraud, and for an accounting. On June 11, 1954, a decree was entered in favor of plaintiff and against defendant dismissing defendant's counter-complaint; finding that the parties were partners; that the partnership was dissolved by the acts of the parties on January 31, 1951, and that an account should be taken as of that date. Based upon a master's report stating the account, the court on July 2, 1956, entered a decree finding that defendant was indebted to plaintiff in the sum of $7,387.90, plus master's fees and the other costs. Defendant appeals from this decree.

Defendant asks for a review of all the proceedings, including the findings in the first decree of June 11, 1954. Plaintiff contends that our review should be confined solely to the findings in the decree of July 2, 1956.

Plaintiff filed a motion in this court to strike certain portions of plaintiff's brief pertaining to the decree of June 11, 1954. On October 25, 1957, we entered an order finding that the decree of June 11, 1954, was a final and appealable decree and determined the rights of the parties except as to the account, and that defendant having failed to appeal from this decree this court was precluded from considering the issues therein determined. We decided that the only issues that would be considered were those pertaining to the accounting between the parties as set forth in the decree of July 2, 1956.

Subsequent to the entry of our order, the Supreme Court decided the cases of Ariola v. Nigro, 13 Ill.2d 200, and Hanley v. Hanley, 13 Ill.2d 209, interpreting section 50(2) of Chapter 110 of the Illinois Civil Practice Act, which provides:

"If multiple parties or multiple claims for relief are involved in an action, the court may enter a final order, judgment or decree as to one or more but fewer than all of the parties or claims only upon an express

finding that there is no just reason for delaying enforcement or appeal. In the absence of that finding, any order, judgment or decree which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not terminate the action, is not enforceable or appealable, and is subject to revision at any time before the entry of an order, judgment or decree adjudicating all the claims, rights and liabilities of all the parties."

In the Ariola case, it was stated that section 50(2) is applicable to a final judgment or decree rendered in a multiple claims action when the judgment or decree determines fewer than all the rights and liabilities in issue or fewer than all of the matters involved in the case. In the Hanley case an appeal was dismissed from a decree of partition which resolved the title to certain real estate because there was undisposed of the accounting between the parties and there was no express finding by the court that there was no just reason for delaying an appeal from the decree. On our own motion the parties were called in and an order was entered on each of them to file a memorandum as to whether or not on the basis of these decisions our order of October 25, 1957, should be vacated and set aside. Thereafter we concluded our order of October 25, 1957, should be vacated because the decree of June 11, 1954, determined fewer than all of the issues and section 50(2) applied. It, being procedural, was therefore retroactive. Plaintiff was ordered to file a reply to that portion of defendant's brief pertaining to the decree of June 11, 1954.

Plaintiff now contends in his brief that this court was in error in setting aside the order because by the decree of June 11, 1954, which was prior to January 1, 1956, the effective date of section 50(2), the plaintiff became vested with property rights in the partnership

and the legislature had no power to make the act retroactive so as to affect his interest.

The question under the circumstances of what is a vested right, to say the least, becomes difficult to ascertain. It was aptly put in Orlicki v. McCarthy, 4 Ill.2d 342, 347, when our Supreme Court stated:

"However, the concept of 'vested right' is fraught with vagaries that defy precise definition. (Merlo v. Johnston City Coal Mining Co., 258 Ill. 328; Theodosis v. Keeshin Motor Express Co., 341 Ill. App. 8.) The concept has been referred to as 'something more than a mere expectation, based upon an anticipated continuance of the existing law. It must have become a title, legal or equitable, to the present or future enjoyment of property, or to the present or future enjoyment of the demand, or a legal exception from a demand made by another.' Beutel v. Foreman, 288 Ill. 106; People v. Lindheimer, 371 Ill. 367; Wall v. Chesapeake and Ohio Railway Co., 290 Ill. 227; Board of Education v. Nickell, 410 Ill. 98."

Since the opinion in the Ariola and Hanley cases, the Supreme Court decided Getzelman v. Koehler, 14 Ill.2d 396, which is similar to the instant case. A partition suit was involved. The action was filed in December of 1954. Various parties filed counterclaims and special defenses. The cause was referred to a master who filed his report. In October of 1956, the court ordered partition. In February 1957, the decree was entered confirming the commissioner's report. The cause was rereferred to a master for hearing on fees, expenses and an accounting. In November of 1957, the court entered a decree confirming the master's report. The defendants appealed from this decree. Plaintiffs, as in our action, contended that the decree of October 1956 was final and appealable and since the appeal was taken only from the decree of November 1957, the court had no jurisdiction to review the October 1956 decree.

They cited as authority for this contention some of the decisions cited by us in our order of October 25, 1957. The court held (p. 400):

"A party, wishing to appeal from a partition decree before disposition of an accounting or other issue, should move the trial court to make an express finding in its decree that there is no just reason for delaying appeal therefrom.

"Since the decree of October 22, 1956, was not appealable at that time, it is now proper to consider the alleged errors therein."

The court then proceeds to review the entire record.

██ We are aware that the various decrees were all entered subsequent to the effective date of the amendment of the Practice Act under section 50(2). Implicit in the court's conclusion is the fact that the decree of partition, which determined the interest of the parties in and to the property involved, was not final until "the disposition of the accounting." It follows then in the instant case that under the construction of the statute the decree of June 11, 1954, which determined that a partnership existed, was not final until the determination of the accounting by the decree of July 2, 1956. Defendant's right to appeal from the decree of June 11, 1954, which determined only a part of the issues, was, therefore, procedural. In line with the Ariola, Hanley and Getzelman cases, we are of the opinion that plaintiff acquired no vested rights thereby. Section 50(2) applies and any and all orders or decrees entered prior to the decree of July 2, 1956, are reviewable.

We will now consider defendant's contention that the trial court erred in its decree of June 11, 1954, in finding against the defendant and dismissing defendant's countercomplaint and finding the equities in favor of plaintiff. She argues that the findings of the

master, which were in her favor, based upon her countercomplaint were amply sustained by the record and that the court erred in entering the decree in favor of plaintiff.

The record reveals that the cause, based upon the complaint and countercomplaint, was referred to a master in chancery in August of 1951 for the purpose of taking testimony and to report the same to the court, together with his conclusions on the facts and the law. In November 1952, the master was ordered to render "his report on the question of the date of dissolution of the partnership." This order, however, did not set aside the original order of reference so that it remained in force and we can see no reason to discuss the order of November 1952, although its effect is argued by plaintiff. In February of 1953, the master filed his report finding that the plaintiff was guilty of fraud; that he had defrauded the defendant of $8,516.31; that there was no partnership because the transaction was permeated with fraud; that the plaintiff put nothing in the business; had no interest therein, and did not come into equity with clean hands. Objections filed by the plaintiff to the report were overruled and ordered to stand as exceptions. Subsequently, the trial court entered the decree of June, 1954, which overruled the master's findings and found for the plaintiff.

██ It is well established that the rule against disturbing the findings, unless contrary to the manifest weight of the evidence, applies only where the master's report has been approved by the chancellor and in the absence of such approval the master's finding of fact does not carry the same weight as the verdict of a jury or the findings of a chancellor in cases in which the evidence has been taken by the court. Accordingly, where exceptions to a master's report have been sustained and a decree rendered contrary to the recommendations of the master, the Appellate Court is as

free to pass on the question of the credibility of the witnesses and the question of the preponderance of the evidence as the lower court. 2 I. L. P. Appeal and Error, section 791, at p. 767; Hahn v. Geiger, 96 Ill. App. 104, 114 (1900). Eyer v. Read, 345 Ill. App. 293 (1952).

Under the circumstances, it is necessary for us to examine the record to ascertain the pertinent facts so that we may determine the issues.

For about 25 years prior to 1950, one John Maxwell owned and operated Maxwell's Vegetarian Restaurant and Health Food Store at 236 South Wabash Avenue, Chicago, Illinois. By the fall of 1950, the restaurant was in debt to the State of Illinois for unpaid sales taxes in the amount of approximately $4,000, owed $2,000 in back rent and numerous other unsatisfied obligations, one of which was purported to be plaintiff's claim that Maxwell owed him $7,000 for unpaid loans to the restaurant made during the previous few years.

In an effort to attract new capital to the failing business, Maxwell, plaintiff and three others secured a corporate charter from the District of Columbia, on September 25, 1950, for the Maxwell Vegetarian Cooperative, Inc. The proposed financial plan stalled because purchasers for shares in the Cooperative were scarce. Though the testimony as to when plaintiff and defendant first met is conflicting, it is agreed that they were both present with others at the home of Mrs. Fern Lasser, secretary of the Cooperative, on October 30, 1950. At this meeting, the future prospects of the Cooperative as a means of aiding the faltering restaurant were discussed. Upon introducing defendant to plaintiff, Mrs. Lasser told plaintiff that "This lady [defendant] has a little money that she would like to invest, buy some shares . . . ." Defendant testified that when she questioned the ability of the restaurant

541

to pay expenses, plaintiff showed her a profit and loss statement, allegedly prepared by Maxwell, which disclosed that the restaurant "had cleared $3,300 plus their expenses" during 1949. Plaintiff testified that he never showed defendant any statement and that he merely told her that Maxwell had said that the restaurant had made money. When defendant said she would like to invest some money in the restaurant, plaintiff claims that he told her he would talk to Maxwell about it.

The following night, October 31, 1950, plaintiff, defendant, Maxwell, Donald Frey, an attorney for Maxwell, and others met at the restaurant. When defendant discovered that if she invested her proposed $6,500 she would only have one vote in the Cooperative the same as perhaps hundreds of other as yet undetermined investors of lesser amounts, she intimated that she might well decline to invest in the Cooperative. Plaintiff thereupon proposed to her that the two of them buy the restaurant as partners and forget about the Cooperative. Defendant assented and it was agreed that the purchase price would be $15,000 with plaintiff and defendant each paying $7,500 to Maxwell. The $15,000 figure, the same value the Cooperative had placed on the business, was admittedly grossly exaggerated, but plaintiff said it was justified because the restaurant had developed a great deal of good will and was going to do business all over the United States. This despite the fact that the business had been operating at a loss.

Defendant gave her check for $6,500, made out to plaintiff. Plaintiff in turn gave it to Frey, the attorney, who was to act as escrowee of the fund for the purpose of paying claims against the business, and the balance, if any, to Maxwell. Defendant then learned for the first time that plaintiff's contribution was to be made up of the cancellation of an alleged indebtedness of

Maxwell to plaintiff in the amount of $7,000 and an actual cash contribution of only $500. Though plaintiff claimed to have evidence of this indebtedness, none was ever presented. Frey, present with a typewriter, prepared the Articles of Partnership. It was agreed that the partners would take possession of the restaurant the next day, November 1, 1950. It was further agreed that defendant would have the right at any time to purchase plaintiff's interest. After the meeting, plaintiff and defendant went to Bert Taylor, the renting agent of the building in which the restaurant was located, and both signed a lease which was dated November 1, 1950, and was to expire five years after date.

Shortly thereafter defendant paid the $1,000 remaining in her share of the purchase price and then opened a partnership bank account with an additional $3,000 from which either she or plaintiff could draw. Plaintiff drew out over $1,000 after which defendant had the account closed and the balance transferred to her personal account. The testimony as to the use to which plaintiff put the drawn funds is conflicting, he claiming that they were all used to pay for purchases made for the restaurant, and she denying same.

At the end of each of the first two days of business, Maxwell entered the restaurant and collected the day's receipts which he retained. Though defendant did not understand such action, she allowed it. Defendant stated that such amounts taken by Maxwell actually represented the $500 balance owed by plaintiff to Maxwell on plaintiff's share of the purchase price of the business.

Although defendant devoted her entire time and attention to the operation and management of the business, plaintiff made no effort to aid her. At most, the evidence discloses that he walked into the restaurant to eat occasionally. When it became evident to defend-

ant that the partnership arrangement would not be successful, she sought to purchase plaintiff's interest according to the terms of the Articles of Partnership. In January 1951, defendant contacted Frey, the attorney who had helped form the partnership, to aid her in her desire to buy plaintiff out. Frey, originally Maxwell's attorney, testified that up to this time he merely had acted as an intermediary between the parties. Frey, who had divers communications with both plaintiff and defendant during January 1951 concerning the value of plaintiff's partnership interest, testified that he believed that both partners intended that the partnership cease as of January 31, 1951. Although correspondence from Frey to each of the partners indicates that the partnership was to be concluded as of January 31, 1951, defendant testified that she did not read Frey's letters very seriously. After February 1, 1951, Frey just represented the plaintiff. Defendant contacted Crescent O'Connor, an attorney, on February 2, 1951, to represent her. On February 10, 1951, plaintiff, defendant, Frey, representing plaintiff, and O'Connor, representing defendant, met at the restaurant to discuss the dissolution of the partnership. Various meetings and correspondence followed and irreconciliable disputes regarding the value of plaintiff's interest in the partnership and the effective date of the partnership's dissolution resulted. Subsequent to January 31, 1951, defendant continued to operate the business at a loss. Both plaintiff and defendant, to say the least, were difficult witnesses.

There are no Illinois cases on the question involved, but in 68 C. J. S., sec. 13, a statement which is amply supported by cases from other jurisdictions, reads as follows:

"Parties when treating for a contract of partnership are bound to exercise the utmost good faith toward each other, since they are contemplating a relation in

the highest degree confidential. Accordingly, a person who has been induced by fraud or misrepresentation to enter into a contract of partnership will be relieved therefrom. A partnership contract induced by fraud is voidable, and not void."

This is in line with the Illinois theory on partnerships. See 29 I. L. P. Partnership, section 71, at p. 318.

It is apparent from the record that from the inception of the transaction in question plaintiff's dealings with the defendant were tainted with deception, if not fraud. It was his duty to disclose the true facts relating to the business before the partnership was entered into. We are unable to determine from the evidence what sum or sums of money, if any, he actually invested in Maxwell's Vegetarian Restaurant and Health Food Store, nor what his real relationship was with Maxwell. Not until after the partnership was entered into did he reveal that he was going to pay his share of the investment by cancelling the purported debt that Maxwell owed him. He participated in the representation that the business was profitable when he knew the contrary was the truth. The record discloses many other incidents pertinent to the partnership which he failed to reveal.

Applying the statement of the law heretofore set forth, we can reach no other conclusion but that the findings should have been for the defendant on her countercomplaint.

■■ The master, who heard the testimony pertaining to the partnership transaction, admitted that he had done some investigating on his own. This he should not have done. However, from our examination of the record, we are of the opinion that his findings of fact were based only on the evidence taken and heard at the hearings and were not affected by his investigation. The findings were amply sustained by the record.

545

An examination of the master's report reveals that in his conclusion he went beyond the prayer of plaintiff's complaint in that he found that no partnership existed because the whole transaction was permeated with fraud. While the agreement may have been voidable, it is clear from the record that defendant continued to operate the partnership business even after she realized that plaintiff was not going to perform his part of the agreement. She thus evidenced her intention not to have the partnership rescinded or the contract voided. We are of the opinion, therefore, that it was error for the master to find that no contract existed. We are, however, of the opinion that the defendant should have the relief that she prayed for in her countercomplaint.

We find no basis in the record for the court's decree of June 11, 1954, overruling the master's report. The decree of the trial court of June 11, 1954, is reversed and it follows that the decree of July 2, 1956, is reversed. The entire cause is remanded to the trial court with directions to enter a decree pursuant to the relief prayed for by the defendant in her countercomplaint and the court is directed to take such further action as is necessary to carry out the terms of the decree.

Decree of June 11, 1954, reversed; decree of July 2, 1956, reversed; and cause remanded with directions.

McCORMICK, P. J. and SCHWARTZ, J., concur.