Thomas C. Chimera, J.
The issues relate to three alleged joint ventures for the purchase and sale of foreign stamps which for the sake of brevity shall hereafter be referred to as the “ Russian ”, “ Polish ” and “ Liberian ” deals.
The trial was long, the evidence elusive at times, and the voluminous exhibits saturated with figures, some accurate and others admittedly false.
I am grateful to counsel for making a transcript of the lengthy record of the trial available to the court. Even with this transcript, the task of the court was burdensome and time-consuming. Without it, a decision would have been impossible.
The Russian deal sparked the whole controversy. It resulted from a meeting between Michael Gluck, vice-president of plaintiff corporation, and defendant Louis Tankel, held in the latter part of October or early in November, 1956, at which time Tankel is said to have informed Gluck that the former was contemplating a visit to Russia, Poland and Czechoslovakia, ostensibly to make stamp purchases. (Here it must be noted that both were in the business, separately, of buying and selling foreign stamps.) The exact language of the conversation that ensued is the subject of conflict, but from all that was said, it may be safely concluded that Gluck expressed his ability and willingness to enter into a joint venture with defendant Tankel if the latter should engineer abroad a substantial deal acceptable to the former. Thereafter defendant did, in fact, leave for Moscow.
On November 28,1956, defendant cabled Gluck from Moscow, as follows: ‘ ‘ Cable at once our best offer for Eight Thousand Mint North Pole C 95-96 total tirage Fifteen Thousand Stop Moscov original new issue price Three Dollars per set.” This deal was turned down by plaintiff.
On November 30, 1956, defendant sent a postcard to Gluck from Moscow, which, when translated, reads as follows: “I am sending you regards and in the meantime am negotiating here and by the end of the week will know everything.”
On December 4, 1956, defendant entered into an agreement with 11 Kniga ’ ’, a Russian stamp agency, for the purchase of 10 lots of Russian stamps at a total price of $125,000, and placed *843 with .said agency his personal check for $12,500 as a deposit to bind the agreement. The agreement required that at least one lot a month was to be paid for and removed by defendant and that by October 1,1957, the last of the lots was to be picked up; the $12,500 deposit was to be applied toward the payment of the last of the 10 lots; the Chase National Bank in New York was designated by “Kniga” as the depositary of the stamps and defendant was to effect such removal upon the payment to the bank of the moneys required and called for by the agreement. In the event of default by defendant, the $12,500 deposit was to be forfeited. The first lot of stamps was to be delivered to the depositary within 45 days from the date of said agreement.

All of these arrangements were made by defendant Tankel in his own name and without any previous consultation with Gluck.

Toward the end of December, 1956, after his return from Europe, defendant communicated with Gluck and the parties met at the former’s office.
Gluck testifies that at this meeting defendant delivered to him a purported typewritten copy of the latter’s original agreement with “ Kniga ” which Gluck now says was in fact identical with plaintiff’s Exhibit “8”, except that the purchase price was represented to be $250,000 instead of $125,000 and the stipulated deposit amount and installment payments were also doubled.
Gluck goes on to say that defendant at that time also delivered to him a separate typewritten copy of specifications covering the gross lots of stamps to be purchased under said agreement; that defendant said that he had issued his check for $25,000 to “ Kniga ” representing a down payment of 10%; that defendant expected the first lot of stamps to arrive at the depositary in February, 1957; that Gluck studied the Russian deal very carefully, using Scott’s Catalogue merely to identify the stamps, and on the basis of his own calculations, came to the conclusion that a 30 to 40% profit could be realized at the $250,000 figure ; that Gluck accepted the deal several days later. Gluck further testified that although he was free at that point to accept or reject, if he had known of the true price paid by defendant, to wit, $125,000, he would not have entered into the deal for $250,000. Gluck’s explanation for his failure to produce at the trial a copy of the original contract between defendant and ‘1 Kniga ’ ’, which indicated the purported purchase price of $250,000, is that after he had taken possession of such agreement, defendant came to him and advised him that it was necessary for said copy to be recorded with the Secretary of *844 State in Washington and that the said agreement would be returned after recording but that defendant failed to return same although requested by Gluck to do so.
Defendant’s version is radically different. Defendant testifies that on December 4,1956, he entered into an agreement with “ Kniga ” on a personal basis to purchase the Russian stamps for $125,000; that he was under no obligation to reveal this to Gluck; that at no time did he represent to Gluck that he had agreed to pay “ Kniga ” $250,000 for the stamps; that he never showed Gluck a copy of the original agreement whereby he was purportedly paying “Kniga” $250,000 for the said stamps; that he never delivered to, or took back from Gluck any document purporting to be an agreement with ‘ ‘ Kniga ’ ’; that he offered to sell the Russian deal to Gluck and himself as coadventurers for the sum of $250,000 and the decision to enter into such joint venture or not rested solely with Gluck; that Gluck expressed his opinion that the proposition looked like a $500,000 deal but wanted time to study the transaction with the aid of Scott’s Catalogue which defendant furnished to him; that after considering all the details in connection with the Russian deal, Gluck was satisfied that he could make a good profit and the deal was closed between them solely on this basis.
Both defendant and Gluck are in accord that by the terms of the agreement arrived at between them, each was to advance to the joint venture the sum of $25,000; that half of the $50,000 thus provided for was to be applied as a deposit to bind the deal; that the other half was to be used to withdraw the first lot of Russian stamps and that thereafter, as each lot was sold, so much of the proceeds of such sale as was necessary to accomplish the purpose would be used to defray the cost of withdrawing the succeeding lot of stamps.

The facts are also undisputed that in partial implementation of this agreement, defendant and Gluck jointly borrowed the sum of $25,000 (later repaid by them, half each), and that the entire sum was turned over to defendant, who put it all into his own pocket, as he says he had a right to do.

It appears that no attempt was made by defendant to redeem any of the Russian stamps until long after Gluck had been given to understand that the deposit was forfeited and the entire deal “lost”. Defendant says that the Russian deal was “lost” because of plaintiff’s failure to pay into the joint venture the $12,500 balance of the $25,000 required of it to be paid pursuant to the original agreement between them. Gluck, on the other hand, not only denies this but insists that it was defendant who failed to contribute his share to the joint venture. More than *845 this — Gluck suggests that plaintiff was lulled into a false sense of security by defendant’s assurances that there was no compelling necessity for meticulous compliance with the conditions of the Russian deal. The evidence seems to support this suggestion.
There is enough in the evidence, too, to indicate that the parties intended to substitute new arrangements for the original ones by adding two other deals to the joint venture.
It is conceded that between the date of their Russian stamp agreement and the date on which the parties were expected to dislodge the first lot of Russian stamps, plaintiff was encouraged to invest $19,500 in the Polish deal (now also disclosed as a “ double deal” in part) and later was inveigled into the Liberian deal by defendant’s misapplication of an additional sum of $7,500 advanced by plaintiff for use toward the Russian deal. So that what started out as a single deal soon blossomed into a triple deal studded with “ double deals ”.
On the examination before trial of defendant it was disclosed for the first time that, in spite of the fact that Gluck was given to understand that the Russian deal was “lost” to the joint venture, defendant managed to withdraw one lot of Russian stamps from the Chase National Bank in October, another in December, 1957, and sold both lots at a profit without telling Gluck about it. Defendant claims he had a right to do this and that he has no duty to account to plaintiff under the circumstances above described.
The mere purchase of something, to be paid for by two or more persons who divide the purchase between them, does not spell out a joint business or partnership. But if the purchase is made with the intention of reselling, it is well settled that such persons are partners whether their relationship contemplates one adventure or a series of them.
Is there any question that the parties contemplated a joint business? Their preliminary conversations indicate it, and the postcard and cable (plaintiff’s exhibits 1 and 6) confirm it. Indeed, reasonable men might say that the clue to the real agreement between the parties will be found in the cable itself (plaintiff’s exhibit 6), from which it appears that the parties originally intended not that defendant was to sell a/nything to a partnership to be formed, but that defendant would buy something for both parties if the terms were first agreed upon by plaintiff. What other significance can be attached to the opening icords of the cable (plaintiff’s exhibit 6): “ Cable at once our best offer etc. ”?
*846 Defendant strenuously argues that no joint venture can he said to exist between the parties prior to the time that plaintiff had an opportunity to evaluate the proposition and to give his assent to the deal. There can be no doubt of this! It is one thing to say, however, that the legal consequences of a joint venture begin on a given date, and quite another to say that whatever happened prior to that date may not operate to fasten a duty on each partner to exercise toward the other the highest integrity and good faith — indeed, a full and faithful disclosure.
Citing authorities for each fragment of his utterances, Professor Gilmore in his Handbook on the Law of Partnership including Limited Partnerships (West Pub. Co., 1911), seems to have covered the law applicable to every facet of this litigation. In language that cannot be improved upon, both for clarity and brevity, among other things, he said on page 376 of his respected work: “ This obligation to perfect fairness and good faith is not confined to persons who actually are partners, but applies in all stages of their connection. There is some authority for the proposition that with regard to the preliminary negotiation of prospective partners the rule of caveat emptor applies, and each may therefore secure for himself such share in the contemplated firm as he can. The tendency of the cases, however, is undoubtedly to require frank disclosure and honest dealing from the very first. Thus one who contemplated forming a partnership may not appropriate to himself alone the gain from buying at a low figure, and selling to his firm at a higher, the property in which the firm is designed to deal.,, (Italics ours.) (Of special interest on this point, see Fouse v. Shelly, 64 W. Va. 425.)
Gluck insists that he would not have entered into the Russian deal if he had known that he was being offered the same at double the cost to defendant. Defendant strenuously argues that plaintiff relied entirely on his own calculations and that such reliance excludes the possibility of his having relied on defendant’s alleged representations as to cost. I cannot say that reliance on representations as to cost and the privilege or right to make one’s own estimate as to value are so mutually exclusive as to render them incapable of existing together in the same “ climate ”.
Assuming but not deciding that the acts of defendant prior to plaintiff’s acceptance of the Russian deal, as defendant claims, were not in contemplation of the formation of a partnership — • that the Russian deal was intended to be an out-and-out sale from defendant to plaintiff and defendant as coadventurers, the conclusion of fraud is nevertheless inescapable. There is *847 enough in the record to justify this court’s conclusion that defendant, by utterances at least, if not by document, sought to influence plaintiff’s entry into the Russian deal by representing to the latter that he had purchased the Russian stamps for $250,000. All the pious denials on defendant’s part fail to overcome the implications of his acts. What was all that hocus-pocus leading up to the joint borrowing of $25,000 on January 8,1957, designed to accomplish, if not to give substance to the representation that that sum was to cover the initial cost of binding the Russian deal?
The law appears to be settled that a vendor is not bound to speak on the subject of cost to himself, but if he does, he must speak the truth. The rule rests on a combination of human experience and sound reasoning, based on the postulants:
(1) that representations as to price paid stand on a different footing than representations as to value, the former dealing with a fact while the latter being at most an expression of opinion;
(2) that the actual cost of an article is a material fact which not only tends to enhance the value, but gives to it a firmness and effect beyond the force of mere opinion; and, finally,
(3) that a misrepresentation as to the cost of an article is naturally calculated to mislead the purchaser (Sanford v. Handy, 23 Wend. 260; Fairchild v. McMahon, 139 N. Y. 290).
In the light of the principles of law above enunciated, the testimony and exhibits shed their elusiveness and four basic conclusions become increasingly apparent:
(1) Defendant was the supreme architect of the entire joint venture and its trusted manager.
(2) Regardless of their agreement, defendant cannot in equity “ appropriate to himself alone the gain from buying at a low figure, and selling to his firm (the joint venture) at a higher, the property in which the firm is designed to deal.” (Gilmore, Law of Partnerships, p. 376.)
(3) Defendant from the very first intended to and did manipulate the three deals so as to gain the advantages of them without risking much, if any, of his own capital.
(4) With so many “ irons in the fire ” and with the natural expectation of profit from the anticipated sales of so many stamps, at an honest price to the joint venture, it is mathematically certain that it would not have been necessary for plaintiff to make any further advances to the Russian deal
There was, of course, mutual trust and confidence between the parties. Plaintiff says so, defendant admits it and the facts prove it! This, together with the undisputed fact that defendant *848 was the managing coadventurer, makes him a trustee of any benefit or profit derived by him from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property (Partnership Law, § 43, subd. 1), and “ partners shall render on demand true and full information of all things affecting the partnership.” (Partnership Law, § 42.)
His duty to account is imperative and he must account for any secret profits that he has made (May v. Hettrick Bros. Co., 181 App. Div. 3; Matter of Kohn, 116 N. Y. S. 2d 167, affd. 282 App. Div. 1045).
The ringing words of Cabdozo, Ch. J., in Meinhard v. Salmon (249 N. Y. 458) stand as a memorial and a warning and it seems that they cannot too often be repeated.
Speaking for the Court of Appeals (pp. 463-464), he said: 11 Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm’s length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the ‘ disintegrating erosion ’ of particular exceptions (Wendt v. Fischer, 243 N. Y. 439, 444). Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court.” (Italics supplied.)
Later in the same opinion (p. 468), he said: “ For him and for those like him the rule of undivided loyalty is relentless and supreme ”.
If equity must be done then, it becomes unnecessary to “ split hairs ” over the significance of the parties’ failure to provide for a division of the traveling and other incidental expenses of the European trip. The Russian phase of the joint venture shall be charged with the sum of $4,200, that being the reasonable and uncontradicted total amount of expenses said by defendant to be chargeable to the Russian deal.
To direct an accounting on the “ First ” cause of action (the Russian deal), will serve no useful purpose, since all of the figures have been conceded and all issues adjudicated. The court therefore directs the entry of judgment in favor of plain *849 tiff in the sum of $16,478 with interest from December 10, 1957, that being the date of the last transaction in the Russian deal. This amount is arrived at by allowing to each party the sums advanced by him, charging to each party a one-half share of all costs including traveling and incidental expenses and crediting each party with a one-half share of the resulting net profit.
The Polish and Liberian deals need not be described here, except to say that plaintiff advanced $19,500 toward the former and $7,500 toward the latter; that defendant advanced $4,500 toward the Polish and $1,000 toward the Liberian deal; that defendant repaid to plaintiff $10,000 on the Polish deal and has never otherwise accounted on either transaction.
Defendant claims that plaintiff is entitled neither to an accounting nor to further refund in connection with the Polish and Liberian deals for the reason that plaintiff is said to have reneged without justification on certain of its obligations evidenced by notes. Gluck, on the other hand, justifies his acts in this regard by accusing defendant of first reneging on his own obligations evidenced by other notes. Just what these notes had to do with the deals in question is impossible to determine from the testimony in this case. One thing is certain, however, and that is that when the note obligations of the one are levelled against those of the other an inconsequential offset results, failing to justify defendant’s contention that although he put into these ventures considerably less than plaintiff did, he is nevertheless entitled to retain nearly all of the benefits.
Both these deals were also conceived, engineered and managed throughout by defendant. It is a matter of more than passing interest that while in the Russian deal defendant denies vehemently having exhibited a copy of purchase agreement with false double figures, here at least he brazenly acknowledges that he did so in connection with one of the phases of the Polish deal. Is this because the document in question is still in the hands of plaintifff
The conclusions of law arrived at in the case of the Russian deal are applicable as well to the facts of the Polish and Liberian deals.
The figures in the Polish and Liberian deals, except for limited concessions made at the trial, remain shrouded in mystery and must await a general accounting on the basis of actual cost to defendant in the first instance.
Accordingly, plaintiff’s “Second” and “Third” causes of action relating to the Polish and Liberian deals respectively are severed and respectfully referred to the Honorable Jacob *850 Marks, Official Referee, to hear and determine, with instructions to apply the exact formula for disposition employed by this court in the ‘6 First ’ ’ cause of action.
The “Fourth”, “Fifth” and “Sixth” causes of action were discontinued by stipulation on the record of the trial.
The parties also stipulated on the record of the trial that defendant is entitled to a credit of $1,250 by way of offset with respect to the causes of action numbered ‘ ‘ Seventh ’ ’ to “ Eighteenth ” inclusive of the complaint and all causes of action asserted by defendant in his counterclaims. In effect, this concession disposes of all issues affecting the respective claims of the parties on any and all notes executed by them and outstanding on the date of the trial herein.
In addition to the foregoing stipulation, it must he noted that plaintiff concedes on the record that there is due to the joint venture from plaintiff a credit of $1,533, that being the amount received by plaintiff from its sale of a portion of the Polish stamps. This figure is not challenged by defendant.
The offset and credit thus conceded will not do violence to the propriety of the judgment hereinabove directed by this court on plaintiff’s “First ” cause of action, for it affirmatively appears that the general accounting ordered herein on plaintiff’s “ Second ” and “ Third ” causes of action will result in favor of plaintiff to an extent exceeding those amounts. On the general accounting, those and all other concessions shall be taken into account.
• Settle proposed judgment and order.