Coos
No. 87-383

ALVIS J. WAITE, ON BEHALF OF BRETTON WOODS ACQUISITION COMPANY AND MT. WASHINGTON MANAGEMENT COMPANY, INC.

v.

JOHN E. SYLVESTER, JR.

JOHN E. SYLVESTER, JR.

v.

BRETTON WOODS ACQUISITION COMPANY

JOHN E. SYLVESTER, JR.

v.

MT. WASHINGTON MANAGEMENT COMPANY, INC.

June 13, 1989

*Sheehan, Phinney, Bass & Green P.A.*, of Portsmouth (*Michael C. Harvell* and *Daniel P. Schwarz* on the brief, and *Mr. Harvell* orally), for the plaintiff Alvis J. Waite, on behalf of Bretton Woods Acquisition Company and Mt. Washington Management Company, Inc.

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*E. Donald Dufresne* and *Martha V. Gordon* on the brief, and *Mr Dufresne* orally), for the defendant John E. Sylvester, Jr.

BROCK, C.J. Cross-appeals from the decision of the Superior Court (*Manias*, J.) present five issues arising from disputes among the partners of the Bretton Woods Acquisition Company (BWAC), a Georgia limited partnership: (1) whether removal of John E. Sylvester, Jr., the defendant, as co-managing partner of BWAC violated either the partnership agreement or implied covenants of good faith and fair dealing; (2) whether the defendant was entitled to the managing partner's fee and distribution as a general partner after his removal; (3) whether proceeds from the sale of resort assets could be distributed in accordance with the BWAC partnership agreement without considering the agreements of entities which owned two of the resort's major assets; (4) whether the defendant owed the other BWAC partners a fiduciary duty during negotiations regarding the formation of BWAC; and (5) whether the defendant breached a duty to the plaintiff, thus giving the plaintiff a defense to the defendant's valid claim for payment of accrued salary. We affirm in part, reverse in part, and remand.

In December 1983, BWAC was formed to own and operate the Bretton Woods resort (the resort). Directly and through affiliated entities, BWAC owned essentially all the real estate, businesses, and improvements of the resort. As originally formed, BWAC had four general partners, Alvis J. Waite, Douglass C. Smith, Frank W. Hulse, IV, and the defendant, John E. Sylvester, Jr., and one limited partner, North Woods Partners. The BWAC partnership

agreement (the agreement) designated Waite and Sylvester co-managing partners, authorizing them to manage the partnership.

Prior to the formation of BWAC, the defendant had been a managing partner in Bretton Woods Associates (BWA), which owned the resort's improvements and leased its real estate. The defendant held $400,000 of BWA notes, which he agreed to convey to BWAC. As part of his compensation for conveying these notes, the defendant was to receive an unspecified 50-acre parcel of resort property, allocated a value of $100,000. The defendant selected a parcel of land, and the plaintiff agreed to its transfer.

Among the entities affiliated with BWAC was the Mt. Washington Management Company, Inc. (MWMC), a New Hampshire corporation wholly owned by the partnership, which managed the resort. MWMC hired the defendant as its president and chief executive officer. The Bretton Woods Ski Area Complex, on 365 acres of land, was owned by Bretton Woods Alpine Associates (BWAA), a Georgia partnership, which in turn was largely owned by Bretton Woods Ski Area Investors (BWSAI), a Georgia limited partnership composed of the same partners as BWAC, but in differing interests. Mountain Motor Inn Associates (MMIA), a New Hampshire partnership, owned the Lodge at Bretton Woods, a motel on five acres of land. BWAC, along with Waite and Sylvester individually, owned all of MMIA except for 1% interests owned by two other investors.

The plaintiff alleged that during late 1984 and early 1985, the other partners became increasingly dissatisfied with the defendant's performance. Throughout this period, BWAC's cash flow crisis caused difficulty in meeting debt obligations in a timely fashion. The partnership failed to make an installment payment on a long-term note due to Robert Lieb, which allowed Lieb to accelerate the note at great cost to BWAC. On August 17, 1985, Waite notified the defendant of the other partners' decision to remove him as co-managing partner of BWAC; Waite subsequently notified the defendant that his employment with MWMC was terminated.

In September, 1985, Waite, acting on behalf of BWAC and MWMC, filed a petition for injunctive relief against the defendant, seeking to restrain him from participating in the management of the resort. The defendant filed an answer and a cross-petition for declaratory, temporary, and injunctive relief. The superior court held a hearing on these petitions and issued an order allowing Waite to manage the resort pending a hearing on the merits and preserving the defendant's rights as a BWAC partner. The cross-petitions were amended and additional claims among the parties

were consolidated for trial, which commenced in June, 1987. On July 16, 1987, the court issued its decision in an order which formed the basis for the appeals now before us. Both parties moved for reconsideration and clarification, and the court issued a second order on August 31, 1987. The trial court found, *inter alia*, that (1) BWAC's removal of the defendant as co-managing partner was valid; (2) the defendant was not entitled to the managing partner's fee after his removal and was only entitled to distribution as a limited partner; (3) the proceeds of any sale of resort assets should be distributed pursuant to the BWAC agreement; (4) the defendant owed no fiduciary duty to his prospective partners during negotiations leading to the formation of BWAC; and (5) the defendant breached no duty to BWAC which could give rise to a defense against his valid claim for salary accrued as president and chief executive officer of MWMC. Both parties appealed, and we now address the five issues they have raised.

Because the agreement provides that it is governed by Georgia law, in our review of the trial court's decision, we will apply Georgia law to substantive questions regarding the limited partnership, *see* 68 C.J.S. *Partnership* § 451 (1950), and New Hampshire law to procedural matters. *Gordon v. Gordon*, 118 N.H. 356, 360, 387 A.2d 339, 342 (1978). Under our law, the trial court's findings will be upheld unless they lack evidentiary support or are tainted by error of law. *Burnham v. Downing*, 125 N.H. 293, 296, 480 A.2d 128, 130 (1984).

### I. *Removal of Defendant*

The defendant contends that his removal as co-managing general partner of BWAC violated the limited partnership agreement, the other partners' fiduciary duties, and the implied covenants of good faith and fair dealing. He first argues that because the partners removed him without a formal vote at a duly noticed meeting, they violated the agreement. The trial court found that although the removal vote was conducted informally, without a meeting, it was valid under § 9.02 of the agreement. That section conditions the removal of a managing partner upon the "affirmative vote of Partners" having a 60% or greater aggregate interest in the partnership.

We agree with the trial court's conclusion. In *Consortium &c. Co. v. Mutual Am. Corp.*, 246 Ga. 346, 271 S.E.2d 488 (1980), the Georgia Supreme Court approved the removal of the general partners at the direction of a limited partner owning more than

the requisite partnership interest. The court held that the removal was effective despite the lack of notice to the general partners before the controlling limited partner took action. *Id.* at 348, 271 S.E.2d at 490. The only procedural requirement explicit in the BWAC agreement's § 9.02 is "delivery of written notice of such removal to the Managing Partner." The section requires notice of removal after the fact; it does not require notice before a vote. We will not infer additional due process type protections from the agreement's removal provisions. *See Holman v. Coie*, 11 Wash. App. 195, 208, 522 P.2d 515, 521 (1974), *cert. denied*, 420 U.S. 984 (1975). To do so would "frustrate[ ] the unambiguous language of the agreement and the result contemplated." *Id.* at 211, 522 P.2d at 524. The trial court therefore properly relied on *Consortium &c. Co.* in concluding that notice was not required before the defendant's removal. Contrary to the defendant's contention, the agreement's use of the word "vote" does not require official notification and a formal meeting. The terms of the BWAC agreement, in conjunction with Georgia law, *see* GA. CODE ANN. § 75-401 *et seq.*, provided all the procedures required. BWAC partners holding over 60% of the partnership interest agreed to the removal; their decision complied with the agreement.

■ The defendant also argues that the vote to remove him as a managing general partner was invalid because § 5.07 of the agreement, providing that "Limited Partners shall take no part in the conduct or control of the Partnership business," precluded the limited partner, North Woods Partners, from participating in a decision affecting the partnership's management structure. Section 9.02 authorizes the removal of a managing partner upon a vote of "Partners" having an aggregate partnership interest of at least 60%. Section 1.01(u) defines "Partners" to "mean collectively the General Partners [and] the Limited Partners." This express grant of voting authority to limited partners supersedes § 5.07's broad restriction on limited partner participation. *See Griffin v. Barrett*, 155 Ga. App. 509, 510, 271 S.E.2d 647, 648 (1980) (specific provision prevails over broader one); *see also Kilroe v. Troast*, 117 N.H. 598, 601, 376 A.2d 131, 133–34 (1977) (express grant in agreement supersedes broad ban). The evidence thus supported the trial court's finding that § 9.02 "expressly empowers the holders of 60% interest in the partnership, be they limited or general partners, to remove a managing partner."

The defendant next protests that even if his removal complied with the agreement, the other partners violated their fiduciary obligation of strictest good faith in dealings with respect to

partnership affairs, *see* GA. CODE ANN. § 75-410 (1981); GA. CODE ANN. §75-201 (1981), *repealed by* 1984 Ga. Laws 1439; *Allen v. Sanders*, 176 Ga. App. 647, 649, 337 S.E.2d 428, 430 (1985); *see also* GA. CODE ANN. § 75-122(a) (Supp. 1988). The defendant contends that, in addition to any obligations arising under the agreement, the partners had a fiduciary duty to provide him with notice and an opportunity to be heard before removal.

■ Judge Cardozo memorably described the fiduciary duty partners owe one another: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928). Partners owe each other the duty of strictest good faith even during an attempt to expel a fellow partner. *Holman v. Coie, supra* at 211, 522 P.2d at 523.

In *Holman*, however, the Washington Court of Appeals found no breach of fiduciary duty because there was no evidence that the purpose of the expulsion was to gain any financial advantage to the remaining partners. *Holman v. Coie, supra* at 209, 522 P.2d at 523. In the case before us, the trial court found "a legitimate business purpose in the partners' decision to remove Sylvester." The court determined that the other partners simply "did not share [the defendant's] perspective of the resort's future." The defendant favored more intensive capital investment in the resort than did the other partners. They removed the defendant for a legitimate business purpose: to resolve the "fundamental schism" the trial court found between them and the defendant regarding their respective views of the nature of their BWAC investments. Removal of a partner, intended to resolve a partnership schism, does not violate the fiduciary standard. *Holman v. Coie, supra* at 211, 522 P.2d at 524.

■ In addition, the defendant has not demonstrated that the trial court's finding that the partners acted fairly and in good faith was unsupported by the evidence. *See Holevas v. Mills*, 124 N.H. 292, 295, 469 A.2d 1329, 1332 (1983). The trial court held that the partners acted in good faith to resolve the "fundamental schism" between them and the defendant concerning their views of the resort's future. The partners breached no duty when they removed the defendant.

## II. *Defendant's Entitlement to Fee*

The court found that under § 9.04 of the agreement, a managing partner's rights cease upon the effective date of termination, and

that absent an express agreement to the contrary, this provision controlled the distribution due to the defendant. Section 9.04 provides:

> "*Rights and Liabilities of Managing Partner after Resignation or Removal.* If a Managing Partner ceases to be a Managing Partner, his rights, duties and liability as a Managing and General Partner shall cease as to all future (but not past) obligations of such positions upon the effective date of the termination of such status."

The court ruled that the agreement unambiguously provided that the defendant's distribution status should be that of a limited partner.

The defendant contends on appeal that § 9.04 protected a former managing partner against future liabilities, rather than limited his rights to the distributions due a managing partner. The defendant further asserts that, even if he is not entitled to a managing partner's distribution share, he at least is entitled to distribution as a general partner.

■■■ Georgia law instructs us to construe a contract to determine the meaning intended by the parties. GA. CODE ANN. § 20-702. When contractual language is "plain, unambiguous, and capable of only one reasonable interpretation, . . . the language must be afforded its literal meaning." *Georgia Farm Bur. Mut. Ins. Co. v. Ray*, 148 Ga. App. 85, 86, 251 S.E.2d 34, 35 (1978). Section 9.04 provides that, upon removal, a managing partner's rights cease as to all future obligations of the managing and general partner positions. The use of the word "rights" reflects the parties' intention to terminate a former managing partner's ties to the managing and general partner positions once he has been removed from the managing partner's position. No other intent can be fathomed from the agreement's terms. The trial court correctly ruled that, as of the effective date of his removal, the agreement entitled the defendant to distribution only as a limited partner.

III. *Distribution of Proceeds*

In its first order, the trial court held that the proceeds from any sale of resort assets were to be distributed in accordance with the BWAC agreement's distribution plan, subject to the review and approval of a referee. The defendant filed a motion for clarification, requesting that the court order distribution of proceeds from the sale of certain resort assets pursuant to the agreements of the entities which owned the specific assets. The defendant argued that

the partnership agreements of MMIA, which owned The Lodge at Bretton Woods, and BWAA, which owned the Bretton Woods Ski Area Complex, conflicted with the BWAC distribution provisions and that distribution of those assets in accordance with the BWAC agreement would significantly alter the contractual rights of the parties to the MMIA and BWAA agreements. In response, the court found that the record did not support the defendant's contention that the other agreements superseded or contradicted the BWAC agreement. The court further found that the BWAC agreement expressed the partners' intent that it alone control the disposition of the partnership's interest in the "Complex," which the BWAC agreement defined as "the land, improvements, fixtures and personalty . . . and/or any legal entity or entities owning all or any part of the property. . . ." The court added that the court or an appointed referee would protect any property interests of persons not subject to the BWAC agreement.

The defendant contends that this order was in error because the agreements of MMIA and BWSAI, which owned almost all of BWAA, contained different distribution schemes than the BWAC agreement. He alleges that only the BWAC agreement contains priority distributions to managing partners, and that application of such priority would yield him $200,000 to $400,000 less than would distribution of proceeds from the sale of certain assets under the MMIA and BWSAI agreements. The plaintiff argues that the BWAC agreement overrides the other agreements by virtue of its language and the intent of the parties and because it was executed later in time.

■ If the BWAC agreement supersedes the other partnership agreements, the trial court was correct in ordering distribution of the assets in accordance with the BWAC agreement. The agreement contemplates that its terms would control distribution of proceeds from the sale of any portion of the resort "Complex." It furthermore contains a merger clause which purports to "supersede[ ] any prior understandings and agreements" among the signatories. If the MMIA or BWSAI agreements modified or superseded the BWAC agreement, however, their differing distribution schemes would take precedence over the BWAC plan. *See J. E. M. Enterprises v. Taco Pronto*, 145 Ga. App. 573, 574, 244 S.E.2d 253, 255 (1978). Whether an agreement has been modified or superseded is a question of fact to be determined by the trial court, *see Norair Eng. Corp. v. Porter Trucking Co.*, 163 Ga. App. 780, 784, 295 S.E.2d 155, 158 (1982), and we will not disturb its

finding if supported by sufficient evidence in the record. *Guri (Cushing) v. Guri*, 122 N.H. 552, 555, 448 A.2d 370, 371 (1982).

 The trial court never determined whether the parties not subject to the BWAC agreement intended it to control nor found which agreement was last executed. The parties now dispute the order of the agreements' adoptions, but neither the MMIA nor the BWSAI agreement was entered into evidence. Because the record contains insufficient evidence to support the trial court's ruling, we remand to the superior court the question of whether the BWAC agreement superseded the MMIA and BWSAI agreements, or vice versa. Proceeds of any sale should then be distributed according to the terms of the agreement controlling the particular asset.

## IV. *Fiduciary Duty Prior to Formation of Partnership*

As partial consideration for his contribution to the formation of BWAC, the defendant was to receive an unspecified parcel of resort property allocated a value of $100,000. The defendant selected a particular lot, and the plaintiff agreed to its transfer. In the action below, the plaintiff sought rescission of the conveyance, contending that the defendant knew the lot was worth more than $100,000 and had misrepresented both its value and his plans for the lot's use. The plaintiff argued that the lot was valued at considerably more than $100,000 soon after the transaction, and that although the defendant had stated that he would use the property to build a single-family home for his own use, he quickly commenced plans to develop a multi-unit townhouse project on the property.

The trial court ruled that because the negotiations for the parcel took place before BWAC's formation, the defendant owed the plaintiff no fiduciary duty. The court never determined whether the defendant misrepresented the property's value to the other partners, finding that because the defendant owed no fiduciary duty, his action did not constitute a breach. We hold that the trial court committed no error.

In a Georgia limited partnership, general partners have "all the rights and powers and [are] subject to all the restrictions and liabilities of a partner in a partnership without limited partners." GA. CODE ANN. § 75-410 (1981); *see* GA. CODE ANN. § 75-327a (Supp. 1988). In 1983, at the time of BWAC's formation, partners in Georgia partnerships without limited partners owed each other a fiduciary obligation: "The strictest good faith is required among partners, and that which would not amount to fraud as to third persons may be such a violation of this faith as to justify equity in compelling a partner to give up any advantage thus obtained."

GA. CODE ANN. § 75-201 (1981), *repealed by* 1984 Ga. Laws 1439; *see* GA. CODE ANN. § 75-122(a) (Supp. 1988) (adopting Uniform Partnership Act's fiduciary obligation among partners in "any transaction connected with the *formation*, conduct, or liquidation of the partnership" (emphasis added)); *see also Meinhard v. Salmon*, 249 N.Y. at 464, 164 N.E. at 546; *Clement A. Evans &c., Inc. v. Waggoner*, 197 Ga. 857, 865, 30 S.E.2d 915, 920 (1944) (following *Meinhard* for joint ventures); *Allen v. Sanders*, 176 Ga. App. at 649, 337 S.E.2d at 430 (1985) (partners owe each other duty of "utmost good faith"). The trial court ruled that this duty did not apply between prospective partners during negotiations to form a partnership. We agree.

The rule generally accepted by other jurisdictions under the Uniform Partnership Act imposes a fiduciary duty not only with respect to transactions occurring during the partnership but also with respect to "those taking place during the negotiations leading to the formation of the partnership." *Allen v. Steinberg*, 244 Md. 119, 128, 223 A.2d 240, 246 (1966); *see Elk River Associates v. Huskin*, 691 P.2d 1148, 1152 (Colo. App. 1984); *R. C. Gluck & Co. v. Tankel*, 199 N.Y.S.2d 12, 17–18 (N.Y. Sup. Ct. 1960), *aff'd* 211 N.Y.S.2d 602 (N.Y. App. Div. 1961); *Biagi v. Gregory*, 19 Ill. App. 2d 534, 544–45, 154 N.E.2d 849, 854 (1958); 68 C.J.S. *Partnership* §§ 13, 76; 59A AM. JUR. 2d *Partnership* § 428 (1987); J. CRANE AND A. BROMBERG, CRANE AND BROMBERG ON PARTNERSHIP § 68, at 394 (1968); H. REUSCHLEIN AND W. GREGORY, HANDBOOK ON THE LAW OF AGENCY AND PARTNERSHIP § 188 (1979); L. Beane, *The Fiduciary Relationship of a Partner*, J. CORP. LAW 483, 513 (Spring 1980). This rule reflects the assumption that during negotiations to form a partnership, the parties are not dealing with one another at arm's length, but rather are attempting to structure a common enterprise, one which must be based on trust and loyalty. An equally valid assumption, that parties negotiating to form a partnership deal at arm's length in a struggle for competitive advantage, gives rise to the alternative rule imposing no fiduciary duty until the actual formation of a partnership. *See Walker v. Patterson*, 166 Minn. 215, 220, 208 N.W. 3, 4–5 (1926); *Uhler v. Semple*, 20 N.J. Eq. 288, 292 (1869); 59A AM. JUR. 2d *Partnership supra*; CRANE AND BROMBERG *supra*.

At least one Georgia decision supports the rule imposing no fiduciary duty during negotiations to form a partnership. *Hancock v. Gunter*, 195 Ga. 646, 650–51, 24 S.E.2d 772, 775 (1943). Furthermore, Georgia chose not to institute the Uniform Partnership Act until 1985. We infer from that belated decision that, until

then, the State did not wish to be governed by the Act's provisions. Valid policies underlie both the rule imposing a fiduciary duty during negotiations to form a partnership and the rule delaying the duty's attachment until the actual formation of the partnership. We hesitate to apply a rule under Georgia law to the present litigants that Georgia, for whatever reason, chose not to adopt until 1985.

■ We cannot say, therefore, that the trial court erred when it ruled that the defendant owed the plaintiff no fiduciary duty during their negotiations over the compensation due the defendant for his contribution to the prospective partnership.

## V. *Claim for Accrued Salary*

The plaintiff terminated the defendant's employment as president and chief executive officer of MWMC soon after the defendant was removed as co-managing partner of BWAC. The trial court found that the defendant was entitled to the salary he had earned from MWMC during 1984 and up until the date of his termination in 1985. The defendant had deferred taking the salary due to BWAC's cash shortage, and the plaintiff refused to pay out the money after terminating the defendant's employment. The trial court rejected the plaintiff's assertion, as a defense to the salary claim, that the defendant had breached a fiduciary duty and that he therefore had forfeited his right to the accrued salary.

The plaintiff repeats that argument in the present appeal. The plaintiff contends that the defendant owed a fiduciary duty to MWMC in his capacity as president and chief executive officer (CEO). The plaintiff specifically argues that the defendant's failure to follow instructions to make an installment payment on a long-term BWAC note due to Robert Lieb, which allowed Lieb to accelerate the note at great cost to BWAC, was a breach of the defendant's duty and forfeited his right to receive compensation for services rendered. *See, e.g., American Timber v. Niedermeyer*, 276 Or. 1135, 1155, 558 P.2d 1211, 1223 (1976).

The record, however, does not support the plaintiff's assertions. There is no indication in the record that the responsibility to keep up payments on the Lieb note owed by BWAC devolved on the defendant in his capacity as president and CEO of MWMC. On the contrary, Waite testified that if he had known the note was unpaid, he himself, as co-managing partner of BWAC, would have paid the note. Waite thereby indicated that the responsibility of paying the Lieb note may have devolved upon the BWAC co-managing partners, not the MWMC executive. The defendant's conduct as a

co-managing partner of BWAC cannot create a defense to salary owed him for his employment by MWMC.

 Even if the defendant's conduct as co-managing partner of BWAC could create a defense to salary owed him for his employment by MWMC, he did not breach his duty. The trial court characterized the defendant's failure to pay the note as an "error[ ] of judgment." The trial court's findings of fact must be sustained unless lacking in evidential support. *Burnham v. Downing*, 125 N.H. at 296, 480 A.2d at 130. The record is replete with references to BWAC's cash shortage in late 1984 and early 1985, the period in which the note became overdue. The defendant's decision not to make the payment on the Lieb note in order to satisfy other obligations resulted in the acceleration of the note, costing the partnership a substantial amount more than what was due under the original payment schedule. Nonetheless, the record does not support the plaintiff's characterization of the failure to pay the note as a deliberate departure from the partnership's best interest. The trial court's decision was supported by the evidence, and we uphold its decision that the failure to pay the Lieb note did not give the plaintiff a defense to the defendant's valid claim for salary due.

*Affirmed in part; reversed in part; remanded.*

THAYER, J., did not sit; the others concurred.