In re Steven S. SILVERMAN and
Sharon R. Silverman, Debtors.

Steven S. SILVERMAN, Plaintiff,

v.

Henry E. MILLER, Jr., James C. Ballantine, Miller Building Corporation and
Atrium Development Corporation, Defendants.

Bankruptcy No. 91–05126–8–ATS.
Adv. No. S–92–00081–8–AP.

United States Bankruptcy Court,
E.D. North Carolina,
Wilson Division.

March 12, 1993.

Gary K. Shipman, Wilmington, NC, for plaintiff.

Mark Clayton Kirby, Raleigh, NC, for defendants.

## ORDER

J. RICH LEONARD, Bankruptcy Judge.

Steven S. Silverman ("Silverman") filed this lawsuit in New Hanover County Superior Court seeking damages based on a variety of legal claims. It was removed to this court after Silverman and his wife filed their bankruptcy petition. This case is related to Silverman's pending bankruptcy proceeding, and this court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. The parties have consented to this court's entry of a final judgment pursuant to § 157(c)(2).

This lawsuit is before the court on seven pending motions: (1) plaintiff's motion to compel and for sanctions, (2) defendant Henry E. Miller's ("Miller's") motion to compel, for sanctions, and to tax costs, (3) a motion for summary judgment filed by defendants Miller, James C. Ballantine ("Ballantine"), and Miller Building Corporation ("MBC"), (4) the plaintiff's motion for summary judgment against Miller, Ballantine, and MBC, (5) plaintiff's motion for summary judgment against Atrium Development Corporation ("Atrium"), (6) a motion to exclude evidence and for sanctions filed by defendants Miller, Ballantine, and MBC, and (7) the defendants' motion to strike Silverman's affidavit.

A hearing was held on these motions on February 17, 1993 in Wilmington, North Carolina. For the reasons given below, the court rules that: the defendants' summary judgment motion is granted in part and denied in part; the plaintiff's summary

judgment motions are denied; the cross-motions to compel are denied; defendants' motion to exclude evidence is denied; and the defendants' motion to strike Silverman's affidavit is denied.

### I. Defendants' Motion to Strike Silverman's Affidavit

■ Defendants ask the court to strike the affidavit filed by Silverman in opposition to the defendants' motion for summary judgment. They contend that Silverman's affidavit does not meet the requirements of Fed.R.Civ.P. 56(e) because it includes hearsay and does not show affirmatively that it is made on the affiant's personal knowledge. Defendants also object that the documents accompanying the affidavit are not presented in a meaningful fashion.

The court agrees that Silverman's affidavit contains some statements of opinion and hearsay that are inadmissible. It is also in agreement with the defendants' assessment of plaintiff's presentation of the numerous attached documents.

However, despite this agreement, the court finds itself unwilling to strike these documents. Silverman's affidavit and attachments are the core of his response to the defendants' motion for summary judgment. The court cannot reach a meaningful decision on defendants' motion without consideration of Silverman's best statement of his case. In addition, the improprieties contained in Silverman's submissions are muted by the fact that, at this stage of the proceedings, they are to be considered by the court, not by a jury, and the court is competent to rely only on the portions that are admissible. Accordingly, defendants' motion to strike Silverman's affidavit is DENIED.

### II. Defendants' Motion to Exclude Evidence and for Sanctions

■ On December 7, 1992, the court entered an order authorizing plaintiff's counsel to issue a subpoena to Chloride allowing plaintiff's expert to enter and inspect the Chloride plant. The order provided that the court would determine any objection to the subpoena on an expedited basis. Defendants contend that plaintiff's counsel has abused the subpoena process by: (1) misrepresenting to Chloride that the court had already shortened the time for objection, and (2) sending a video crew to accompany the expert whose entry was authorized by the subpoena. As a sanction, defendants ask the court to suppress the introduction of all evidence related to the inspection.

The court agrees with defendants that the order did not shorten the time for objection to the subpoena or authorize the entry of a video crew on the Chloride premises. Most importantly, the court did not waive plaintiff's obligation to notify the defendants of the time of the requested entry.

Nevertheless, the court is also of the opinion that it would have allowed both inspection and videotaping even if objections had been made. Thus, although the court does not encourage plaintiff's counsel to take such liberties in the future, it is reluctant to grant the relief sought by defendants when plaintiff's failure to formally make these requests has caused no practical harm.

Based on the foregoing, defendants' motion to exclude evidence and for sanctions based on the procedural impropriety is DENIED. However, if counsel for plaintiff lists the videotape as a trial exhibit, counsel for defendants is free to seek its exclusion on the ground that it is incomplete or misleading.

### III. Defendants' Motion for Summary Judgment as to the Complaint

■ "[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In making this determination, conflicts are resolved by viewing all facts and inferences to be drawn from the facts in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d

176 (1962). Summary judgment should not be granted unless the moving party establishes his right to judgment "with such clarity as to leave no room for controversy...." *Portis v. Folk Construction Co.,* 694 F.2d 520, 522 (8th Cir.1982).

## A. Facts

Steven S. Silverman is a former real estate developer and manager who has developed a number of projects using the trade name "Atrium." [1] In 1989, Silverman completed an office building in Wilmington, North Carolina known as Atrium Landfall. Through this development he met Henry E. Miller, Jr., a principal in Miller Building Corporation, a Wilmington building contractor.

In June of 1989, Miller, Silverman, and Ballantine (Executive Vice President of MBC) formed Atrium Development Corporation, a closely held corporation whose purpose was to "acquire, lease, build and manage" commercial real estate. (Affidavit of Silverman at 2.) To fund Atrium's activities, the three principals obtained and personally guaranteed two $125,000 lines of credit from Peoples Bank & Trust. Silverman was named president of Atrium and placed in charge of finding development opportunities for the firm.

### The "Chloride Deal"

In January of 1990, the Chloride Group PLC ("Chloride"), a British company doing business in the United States, solicited bids for a planned facility to be built in the Wilmington area. State and local officials notified MBC and at least one competitor of this opportunity, and MBC began work on a proposal to submit to Chloride. Although Chloride was initially interested in a "build to suit" project, it shortly became clear that Chloride had decided to lease, and not own, its Wilmington facility. The acquisition of this project and all subsequent facets of its development have come to be known as the "Chloride deal."

Plaintiff does not dispute that the Chloride deal resulted from an initial contact between MBC and Chloride, and that the initial work was performed solely by MBC employees. However, he alleges that he and Atrium were asked to become involved once the nature of the deal shifted from construction to leasing and management. In late January of 1990, Miller asked Silverman to work on the Chloride lease with Wilburn Honeycutt, MBC's Vice President for Business Development. (Silverman Affidavit at 5.)

On February 9, 1990, Honeycutt flew to London to discuss the proposed lease with Chloride officials. Silverman alleges that Honeycutt's negotiations did not go smoothly, and states that he was asked by Miller to review the proposed figures over the weekend. Silverman then made suggestions which were incorporated in a revised proposal sent by Honeycutt to Peter Roberts of Chloride on February 11, 1990.

On February 22, 1990, MBC "requested [Silverman] to assume the lease negotiations with the Chloride Group, including the making of additional proposals for alternate lease terms." (Complaint at 2.) In his affidavit, Silverman alleges that this request took the form of a letter from Honeycutt which he understood "to hire" Atrium to perform these functions.[2] (Silverman Affidavit at 5.) Silverman has submitted a copy of this letter, which reads in part:

> As you are aware, Miller Building Corporation has negotiated with Chloride Group PLC to build and lease to them a facility in Pender County.... Your cooperation is needed so that we can confirm preliminary lease rates and provide Chloride with a lease agreement and financial information on the proposed landlord.

---

1. Although the parties agree on a basic factual framework, they present radically different interpretations of the parties' motivations and of certain events. Because this motion for summary judgment is filed by the defendants, the court's summation presents the facts in the light most favorable to the plaintiff.

2. Interestingly, the letter is addressed to "Mr. Steve Silverman, THE ATRIUM DEVELOPMENT GROUP." Atrium Development Group is a South Carolina corporation entirely separate from Atrium Development Corporation.

In order to assist you and to provide guidelines for your proposal we have enclosed:.... You will initiate the lease prior to construction. In making your proposal, your lease rates for a 15 year term should adhere closely to the following values....

(Exhibit 14 to Silverman Affidavit.)

Silverman alleges that pursuant to this request, he negotiated the terms and conditions of a lease with Chloride, found and acquired a suitable site for the facility, and obtained the financing commitments necessary to complete the project. Furthermore, he claims that he performed this work not for Miller Building, but because it was understood among the parties that the Chloride project was to be an asset of Atrium Development Corporation after February 22, 1990.

Acting on this understanding, Silverman retained James J. Kaufman, a Wilmington attorney, to draft the lease. Silverman alleges that a meeting was held on March 22, 1990 to discuss a preliminary draft of a lease which showed Atrium as the landlord. Miller, Ballantine, Silverman, and Kaufman were present at the meeting and confirmed to Kaufman that he represented Atrium, and that Silverman was directing the deal.

### The Proposed Partnership

Silverman alleges that on April 4, 1990, he received a telephone call from a Chloride representative informing him that MBC had been inserted on the lease as landlord in place of Atrium. Silverman immediately telephoned Kaufman, who told him that the change had been directed by Honeycutt. On April 5, 1990, Silverman hand delivered a letter to Miller protesting this change.

Later that day, Silverman and Miller met with Robert Forrest, a potential investor, and discussed restructuring the deal into a partnership to be composed of Miller, Ballantine, Silverman, and Forrest. According to Silverman, Miller assured him that he would remain a principal in the deal. Silverman has submitted a letter from Forrest to Miller which confirms the substance of the April 5 meeting:

Dear Gene:

This will confirm our understanding and agreement, following my April 5, 1990 letter to you, and our subsequent conference today, regarding the Chloride lease. We have agreed as follows:

1. The Chloride lease will proceed in the name of Miller Building Corp., but with its beneficial interest assigned to a group consisting of Gene Miller (to the extent of 25%), Jim Ballantine (25%), Steve Silverman (25%), and Robert Forrest (25%).

2. It is understood that the following must occur to make this assignment operative:

(a) A construction loan to be obtained for Chloride in the amount of $2.1 million dollars, and

(b) One hundred thousand dollars ($100,000) shall be paid to Miller Building Corp. at the close of escrow, to be utilized to directly pay down Atrium Development Corp.'s Two Hundred Thousand Dollar ($200,000) loan from People's Bank ..., and

(c) Robert Forrest will cause Jim Ballantine and Gene Miller to be removed from the remaining One Hundred Thousand Dollars ($100,000) liability with People's Bank, thereby removing personal exposure on this loan to Gene Miller and Jim Ballantine.

(d) Gene Miller and Jim Ballantine will sell out all outstanding Atrium Development Corp. stock to Robert Forrest and Steven Silverman and relinquish any and all rights of Ownership in Atrium Development Corporation.

I ask each of us to sign a copy of this letter to evidence this agreement.

Yours Truly,

/s/ Robert Forrest

Atrium Development Corporation

by Robert J. Forrest

(Exhibit 32 to Silverman Affidavit.) There is no indication that Miller and Ballantine ever signed this letter.

Silverman alleges that after this meeting, he continued work on the Chloride lease under the assumption that he would

be a principal in the deal, provided that the three conditions set forth in Forrest's letter were met. The first condition was satisfied on April 12, 1990, when the four putative partners received a commitment letter from BB & T offering to loan $2.1 million to "[a] North Carolina General Partnership consisting of Henry E. Miller, Jr., James G. Ballantine, Steven S. Silverman, and Robert R. Forrest." (Exhibit 40 to Silverman Affidavit.)

However, before Silverman and Forrest could comply with the remaining two terms, they received a memorandum from Miller revising the terms of their agreement. This memorandum, dated April 16, 1990, adds a number of new conditions:

(1) By April 30, 1990, Silverman and Forrest are to have Ballantine and Miller removed from the Atrium guarantee to Peoples Bank;

(2) By April 30, 1990, Silverman and Forrest are to agree in writing to hold Miller and Ballantine harmless for any actions having to do with Atrium;

(3) Peoples Bank and the general partners of Landfall Atrium are to agree in writing to pay to MBC $86,139 owed to MBC as a result of a separate transaction;

(4) MBC is to be paid its costs plus a 10% fee on the construction contract;

(5) Miller and Ballantine are to own 50% of the financial benefits and liabilities of the Chloride lease and have 60% voting rights;

(6) Forrest and Silverman are to provide proof of financial strength;

(7) The partners are to be liable severally—not jointly; and

(8) A partnership agreement is to be drawn before May 1, 1990.

(Exhibit 41 to Silverman Affidavit.) After reciting these conditions, the final sentence of Miller's memorandum offers Silverman and Forrest the following option:

As an alternative, Jim Ballantine and Gene Miller will entertain an offer for Bob Forrest and Steve Silverman to both relieve Jim and Gene of all obligations to Peoples Bank and transfer all ownership of the Chloride lease to Bob and Steve. *Id.* at 2.

On May 2, 1990, Peoples Bank agreed in writing to reduce the Atrium credit line to $100,000 and to remove Miller and Ballantine from their personal guarantee on this loan. (Exhibit 52 to Silverman Affidavit.) Miller and Ballantine were copied with this letter.

Silverman responded to Miller's April 16 memorandum on May 7, 1990. In his reply memorandum, Silverman agreed to the new conditions placed on the partnership, but asked that voting rights be equalized after Miller and Ballantine were absolved of personal liability on the Atrium Note. (Exhibit 54 to Silverman Affidavit.)

In early May 1990, Jerry Woodell, a Wilmington attorney, produced two draft agreements pertaining to the future partnership. The first document, titled simply "Agreement," is dated May 3, 1990. It states that Miller and Ballantine are establishing Stag Park Properties, a partnership which will hold the beneficial interest of the Chloride lease. It then sets forth certain conditions which Silverman and Forrest must satisfy in order to join the partnership. These conditions, which track the requirements of Forrest's April 5 letter, require Silverman and Forrest to pay down the People's Bank loan to Atrium, and to negate Miller and Ballantine's personal liability on this note. (Exhibit 53 to Silverman Affidavit.) On satisfaction of these conditions, Silverman and Forrest would each become eligible for a 25% interest in the Stag Park Properties partnership upon "the terms and conditions set forth in the partnership agreement...." [3] *Id.* at 3.

The second document drafted by Woodell was the partnership agreement for Stag Park Properties. Silverman has submitted the second draft of this agreement, dated May 8, 1990, as exhibit 56 to his Response.

---

**3.** At oral argument, exhibit 53 was presented as the first draft of the Stag Park Properties partnership agreement. However, the court's reading of this document has convinced it that exhibit 53 is an entirely separate agreement dealing with Silverman's and Forrest's eligibility to participate in the partnership.

Paragraph 22.01 of this agreement gives Miller and Ballantine voting control over the partnership and, when read with other provisions of the agreement, gives them direction over virtually all partnership affairs. In particular, ¶ 18.01 allows them to dissolve the partnership at any time, and ¶¶ 8.03 and 8.04 empower them to summarily expel partners unable to meet any capital calls which they might make.

On May 21, 1990, Silverman received a copy of the Stag Park Properties partnership agreement. Silverman and Forrest discussed the terms of the agreement with Miller and, on May 25, 1990, were informed by Miller that the terms were not negotiable. On May 31, 1990, Forrest wrote Miller and declined to participate in the partnership. His letter to Miller reads in part:

[I]n my review of the Stag Park Properties Document, it is my judgement that this deal is not a good or sound business decision as it pertains to me, in view of the fact that I must put up the $100,000 to relieve you of your liability in Atrium Development Corporation.... I feel that it is not in my best interest to sign or to get involved in this transaction as it stands presently, especially in view of the fact that you had absolute control in the drafting of this document and had it designed entirely to your benefit.

(Exhibit 64 to Silverman Affidavit.)

On June 7, 1990, Silverman received a letter from Miller and Ballantine which: 1) noted that he had "failed to meet the terms and conditions for a partnership related to the Chloride lease," and 2) informed him that the partnership offer was no longer open. (Exhibit 70 to Silverman Affidavit.) That same day, Miller and Ballantine formally demanded an accounting from Silverman with respect to Atrium and suspended his ability to act as agent for the corporation.[4] (Exhibit 72 to Silverman Affidavit.)

From this point on, relations among the parties deteriorated quickly. At an Atrium board meeting held on July 5, 1990, Silverman made a motion that Atrium retain

counsel to investigate the conversion of the Chloride deal by Miller and Ballantine. Miller and Ballantine declined this invitation, and Silverman's motion died for lack of a second. (Exhibit 84 to Silverman Affidavit.) On July 17, 1990, Silverman resigned as president of Atrium. (Exhibit 82 to Silverman Affidavit.)

Silverman filed this lawsuit on September 10, 1991, seeking damages from Miller, Ballantine, and MBC based on quantum meruit, breach of fiduciary duty to Atrium, breach of fiduciary duty to Silverman, breach of contract, diversion of corporate opportunity, conversion, and unfair or deceptive trade practices. Silverman also asks for punitive damages, an accounting, and, in the alternative, brings a number of claims derivatively on behalf of Atrium.[5] Defendants Miller, Ballantine, and MBC have moved for summary judgment as to all of these claims.

### B. Discussion

#### 1. Quantum Meruit

In his first claim for relief, Silverman seeks compensation from MBC for services rendered between February 22 and May 17, 1990 in connection with the Chloride deal. The complaint alleges that on February 22, 1990, MBC requested Silverman to take charge of the lease negotiations with the Chloride Group. Silverman claims that pursuant to this request, he rendered valuable services to MBC, that it accepted the benefit of his labor, and that he has not been compensated for his efforts.

Silverman's affidavit describes his understanding of the February 22, 1990 retention in more detail:

15. Between January 31 and February 16, 1990, I understand Chloride to have decided to lease, and not own, its facility.

16. During this time period, I agreed to perform lease and land negotiations on the Chloride deal. It was my understanding that ADC would be the landlord

---

4. These actions were taken at the June 7, 1990 meeting of the Atrium Board of Directors. *See* Board Minutes attached to exhibit 72.

5. Atrium is named as a nominal defendant on the derivative claims.

and developer of the project. During this time, I spent numérous hours on the project and developed preliminary lease parameters. Of course, I worked with a team of individuals, including Honeycutt.

17. On or about February 22, 1990, I received a letter from Honeycutt which I understood to hire ADC to perform the functions that we had previously agreed on. Again, based on this understanding, ADC and I expended time and energy on the project developing preliminary rough draft lease concepts. No contingencies of any type were involved in ADC's retention of the Chloride deal. Any contingencies arose later after Miller and Ballantine had usurped the Chloride deal from ADC.

(Silverman Affidavit at 5.) Silverman's affidavit makes it clear that from February 22 until April 5, 1990, he believed that Atrium would hold the beneficial interest of the Chloride lease. Indeed, he expressly states his opinion that "as of April 5, 1990, Miller and Ballantine had usurped the corporate opportunity of the Chloride deal *from ADC.*" (*Id.* at 10. Emphasis added.)

Silverman alleges that after April 5 he continued to work on the Chloride deal in the understanding that his efforts would be rewarded by his participation in a partnership to be formed to hold the beneficial interest of the lease. It is undisputed that Silverman remained a corporate officer of Atrium until July 17, 1990, and that his activities in connection with the Chloride lease were consistent with his duties as president of Atrium. However, Silverman did not receive a salary from Atrium after February 28, 1990. (*Id.* at 11.)

■ *"Quantum meruit,* a measure of recovery for the reasonable value of material and services rendered by the plaintiff, is an equitable remedy based upon a contract implied in law." *Potter v. Homestead Preservation Ass'n,* 330 N.C. 569, 578, 412 S.E.2d 1, 6 (1992); *see also Thomas v. Thomas,* 102 N.C.App. 124, 401 S.E.2d 396 (1991). It is axiomatic that when an agent performs services in the name of his principal, the principal, not the agent, holds the right to compensation from the third party. *See, e.g., Anderson Cotton Mills v. Royal Manufacturing Co.,* 221 N.C. 500, 20 S.E.2d 818 (1942). It is equally well-established that a corporate president is an agent of his corporation. *Burlington Industries, Inc. v. Foil,* 284 N.C. 740, 202 S.E.2d 591 (1974).

Silverman alleges that on February 22, 1990, Atrium was "hired" to perform lease and land development functions pertaining to the Chloride lease. He maintains that "[a]t all times prior to April 5, 1990, ADC maintained an interest or expectancy in the Chloride deal." (Silverman Affidavit at 11.) After Atrium's connection to the deal was severed on April 5, Silverman continued working with the expectation that he would personally benefit from his participation in a partnership that Miller and Ballantine would form to hold the beneficial interest in the lease.

These allegations make it clear that between February 22 and April 5, 1990, Silverman was acting on behalf of Atrium in his capacity as a corporate officer. It follows that any implied contract during this period must run between MBC and Atrium, not MBC and Silverman. Thus, any recovery in quantum meruit based on the value of services rendered by Silverman during this time would belong to Atrium, not Silverman.

■ However, Silverman's continued involvement with the Chloride deal indicates that after April 5, 1990, he was personally retained by MBC. Although the extent and value of the services provided by Silverman are hotly disputed, these are issues of fact which must be resolved in Silverman's favor on summary judgment.

Because of the existence of these issues, the court finds a genuine issue of material fact as to whether an implied contract existed between MBC and Silverman from April 5 to May 17, 1990. Accordingly, summary judgment is DENIED as to Silverman's quantum meruit claim for the value of his services during this period.

### 2. Second Claim: Breach of Fiduciary Duty to Atrium

■ Plaintiff next claims that defendants Miller and Ballantine breached their

fiduciary duty to Atrium Development Corporation by diverting the Chloride deal from Atrium to MBC.[6] He alleges:

26. That the Chloride project, including the Lease and the manufacturing facility, from and after February 22, 1990, (the "Chloride deal"), was to be an asset of Atrium Development Corporation.

27. At the request of the Defendants Miller and Ballantine, the Plaintiff retained the services of an attorney who prepared an initial Lease Document between Atrium Development Corporation and the Chloride Group,....

28. That prior to May 17, 1990, the Defendants conspired to convert, and did convert the Chloride deal, an asset of Atrium Development Corporation, unto the Defendant Miller Building.

(Complaint at 5.)

Silverman asserts that he has formally demanded that Miller and Ballantine, in their capacity as officers, directors and shareholders of Atrium, bring an action for the corporation based up on this actions. This motion died for lack of a second, and Silverman alleges that further demand would be futile. On this basis, Silverman asserts that "in order to achieve a fair distribution of the proceeds" of Atrium's claim, he is entitled to a direct recovery from defendants. *Id.*

 A corporate shareholder may normally enforce a claim belonging to the corporation only through a shareholder derivative suit brought on behalf of the corporation. *Robinson on North Carolina Corporation Law,* § 17.1 *et seq.* A suit against corporate officers or directors for mismanagement or breach of fiduciary duty is "[o]ne of the clearest examples of a derivative action...." *Id.* at § 17.2(a). *See, e.g., Goodwin v. Whitener,* 262 N.C. 582, 138 S.E.2d 232 (1964). Shareholders may not bring such suits directly because "the duties, the breaches of which constitute the ground of action, are duties to the

corporation, considered as a legal entity, and not duties to any particular stockholder." *Coble v. Beall,* 130 N.C. 533, 536, 41 S.E. 793, 794 (1902).

Silverman advances two arguments to support his claim that he should be permitted to pursue this claim directly. First, he claims that he has made demand upon his fellow directors, and asserts that further demand would be futile. Second, he claims that a direct action is necessary to achieve a fair distribution of the proceeds. Neither argument is persuasive.

 Because a corporation holds the primary right to enforce corporate claims, the law normally requires a shareholder to demand redress from corporate management before filing a derivative lawsuit. *See Alford v. Shaw,* 72 N.C.App. 537, 324 S.E.2d 878 (1985), *modified and aff'd,* 320 N.C. 465, 358 S.E.2d 323 (1987). This rule is codified in the North Carolina statutes at § 55-7-40, which requires the plaintiff to specifically allege his efforts to demand action from management. If, however, his demand would be futile, the plaintiff is excused from this requirement and must plead only the circumstances making any demand futile.

 The futility doctrine does not allow a shareholder to bring the claim directly. Rather, it simply allows a shareholder to bring a derivative claim without first making demand upon corporate management. Thus, it offers no support to Silverman's attempt to recover directly for the Miller and Ballantine's breach of their fiduciary duty to Atrium.

 Silverman's second argument, that a direct recovery is necessary to achieve a fair distribution of the proceeds, is equally unavailing. Although the North Carolina courts recognize the special nature of closely held corporations, *see Meiselman v. Meiselman,* 309 N.C. 279, 307 S.E.2d 551

---

6. In his memorandum, Silverman argues that the conversion of the Chloride lease violated the fiduciary duty which Miller and Ballantine owed to Silverman as a minority shareholder of Atrium. The court has found nothing in the complaint which pleads such a claim. The sec-

ond claim for relief alleges that the conversion of the lease breached a fiduciary duty owed to Atrium. The third claim for relief alleges a breach of fiduciary duty to Silverman, but is based on the failure of Miller and Ballantine to propose a good faith partnership.

(1983), this court is aware of no North Carolina decision allowing a direct recovery to achieve a fair distribution of the proceeds.

More importantly, Silverman has failed to produce any indication that the proceeds of a derivative action would not be distributed fairly. Silverman is entitled only to his pro rata share of the proceeds of this claim, not the entire amount. The court finds no reason to believe that Silverman would be deprived of this share if the claim is pursued derivatively. Accordingly, the defendants are entitled to summary judgment on this claim.

### 3. Third Claim: Breach of Fiduciary Duty to Plaintiff and Atrium

In his third claim for relief, plaintiff alleges that he confronted defendants Miller and Ballantine with their conversion of the Chloride lease, "at which time, the Plaintiff and the Defendants Miller and Ballantine agreed that the Chloride facility would be owned and leased to the Chloride Group by a partnership to be comprised of the Plaintiff, the Defendants Miller and Ballantine, and Robert J. Forrest." (Complaint at 7.) Plaintiff alleges that he and Forrest took every step necessary to enter into the partnership agreement with Miller and Ballantine. Nevertheless, after satisfying these conditions, they were presented with a draft partnership agreement in which Miller and Ballantine gave themselves voting control over the endeavor, while apportioning liabilities equally among the putative partners.

Silverman alleges that Forrest refused to sign the agreement solely because of the voting control issue. Because Miller and Ballantine refused to enter into a partnership agreement without Forrest's participation, Silverman was effectively deprived of any interest in the Chloride lease. His third claim for relief alleges that these actions by Miller and Ballantine breached fiduciary duties owed to Atrium and to him individually. He alleges two sources for the fiduciary duties owed by Miller and Ballantine: first, their status as officers, shareholders, and directors of Atrium, and second, "these agreements." *Id.*

Viewed broadly, these allegations can be seen as stating three separate claims for relief: (1) a direct claim based on the defendants' breach of the fiduciary duties they owed to the *corporation*, (2) a claim based on the fiduciary duties which Miller and Ballantine owed to *Silverman* as controlling shareholders of a closely held corporation, and (3) a final claim, based not on the parties' status with respect to Atrium, but solely on their later agreement to form a partnership to hold the beneficial interest of the Chloride lease.

#### a. Fiduciary Duty to Corporation

Silverman's attempt to bring a direct claim based on the defendants' breach of the fiduciary duties owed to Atrium by virtue of their status as officers and directors requires little discussion. Like the second claim for relief, this claim belongs to the injured corporation and cannot be asserted directly by a shareholder for the reasons given above. Accordingly, the defendants motion for summary judgment is GRANTED as to this aspect of plaintiff's third claim for relief.

#### b. Fiduciary Duty to Plaintiff as Shareholder

Silverman's third claim for relief can also be read as alleging a claim based on the fiduciary duties which controlling shareholders of a closely held corporation owe to a minority shareholder. *See Meiselman v. Meiselman, supra.* In assessing this claim, it must be remembered that plaintiff's third claim for relief is based on Miller and Ballantine's failure to execute a partnership agreement "consistent with the parties' previous discussions and agreements...." (Complaint at 8.) Thus, for plaintiff to prevail, he must create a genuine issue of material fact as to whether the defendants' positions as officers, directors, and controlling shareholders of Atrium required them to behave as fiduciaries when structuring the Stag Park Properties partnership, an entirely separate business venture.

Plaintiff has presented evidence that Atrium was in the business of developing

commercial real estate ventures like the Chloride project. He has also produced evidence tending to show that the Chloride lease was an asset of Atrium which was usurped by Miller and Ballantine on April 5, 1990. However, the court has found nothing in the record which indicates that the parties' later agreement to form an entirely separate partnership was somehow related to the business of Atrium.

To the contrary, Silverman's own affidavit gives the following account:

> 34. On April 5, 1990, I hand delivered to Miller a letter stating, among other things, that ADC should be the landlord on the lease. At this time, Bob Forrest ("Forrest") met with Miller and then Miller, Forrest and I met. During this meeting, Miller reassured me that I was still going to be a principal on the deal, but that he wished to restructure the same and place us all into a partnership. I had no choice but to agree to this arrangement. It is my opinion that, as of April 5, 1990, Miller and Ballantine had usurped the corporate opportunity of the Chloride deal from ADC.

(Silverman Affidavit at 10.) According to this paragraph, the defendants usurped the Chloride deal on April 5, 1990. Silverman, the only Atrium shareholder who might be disturbed by this turn of events, was pacified by the defendants' offer that *he* could continue to participate in the deal outside Atrium in an entirely separate partnership.

■ Under North Carolina law, defendants Miller and Ballantine owed a fiduciary duty to plaintiff by virtue of their positions as officers, directors, and majority shareholders of Atrium. *Meiselman v. Meiselman, supra.* However, this fiduciary status existed only because of each individual's relationship with Atrium, and it cannot be extended beyond this context to apply to all subsequent business dealings between these parties. *Cf. SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).[7]

It is apparent from Silverman's own submissions that Miller and Ballantine controlled the Chloride lease because of their connection to MBC. Thus, these defendants' ability to exclude Silverman from the deal was entirely independent of their status as directors, officers, and shareholders of Atrium. It is also clear that the Stag Park Properties partnership was offered to Silverman individually and was entirely separate from Atrium Development Corporation. Accordingly, the court finds as a matter of law that the fiduciary duty created by the parties' positions within Atrium did not extend to the partnership agreement.

### c. Fiduciary Duty in Formation of Partnership

■ Finally, plaintiff's third claim can be read as seeking relief based on the breach of a fiduciary duty arising directly from the parties' agreement to form a partnership. Plaintiff alleges that the defendants' failure to propose a partnership in good faith breached a fiduciary duty owed solely *by reason of their prior agreement to enter into a partnership* if certain conditions were met.

North Carolina law defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." N.C.Gen.Stat. § 59–36. It is clear that once a partnership is formed, partners owe one another the highest level of fiduciary duty. N.C.Gen.Stat. § 59–51. However, plaintiff concedes that he never joined the Stag Park Properties partnership, and the court independently finds no indication that Silverman ever became a co-owner in that venture. Instead, plaintiff contends that fiduciary obligations are present before the formation of the partnership, and are enforceable even if the partnership is never formed.

In support of this argument, he cites N.C.Gen.Stat. § 59–51(a), which reads:

> Every partner must account to the partnership for any benefit, and hold as

---

**7.** In the words of Justice Frankfurter: "[T]o say that a man is a fiduciary only begins the analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?" 318 U.S. 80, 85–6, 63 S.Ct. 454, 458.

trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.

Although this section does extend a partner's fiduciary duty to actions connected with the formation of the partnership, it expressly applies to "every partner." There is no indication that it applies beyond this context to individuals who never actually form a partnership.

More importantly, there are no North Carolina decisions adopting the position advanced by plaintiff. Silverman does refer the court to cases from other jurisdictions holding that:

the Uniform Partnership Act imposes a fiduciary duty not only with respect to transactions occurring during the partnership but also with respect to 'those taking place during the negotiations leading to the formation of the partnership.'

*Waite v. Sylvester*, 131 N.H. 663, 560 A.2d 619, 625 (1989), *quoting Allen v. Steinberg*, 244 Md. 119, 128, 223 A.2d 240, 246 (1966). *See also Elk River Associates v. Huskin*, 691 P.2d 1148 (Colo.App.1984); *Herring v. Offutt*, 266 Md. 593, 295 A.2d 876 (1972); and *Biagi v. Gregory*, 19 Ill. App.2d 534, 154 N.E.2d 849 (1958). However, because a partnership was actually formed in each of these cases, they simply confirm the statutory rule.

Based on the foregoing, the court concludes that defendants Miller and Ballantine did not owe the plaintiff a fiduciary duty by virtue of their agreement to enter into a partnership in the future. Accordingly, the defendants' motion for summary judgment is GRANTED as to this claim.

### 4. Breach of Contract

Plaintiff's fourth cause of action alleges that the parties' April 5, 1990 agreement to enter into a partnership if certain conditions were met, constituted a contract between the plaintiff, Forrest, and defendants Miller and Ballantine. He claims that this contract was breached when Miller and Ballantine refused "to exe-

cute a reasonable Partnership Agreement." (Complaint at 9.)

In his affidavit, Silverman states that on April 5, 1990, he, Forrest, Miller, and Ballantine agreed to form a partnership to hold the beneficial interest of the Chloride lease if certain conditions were met. (Silverman Affidavit at 10.) The April 5, 1990 letter from Forrest to Miller confirms the parties' "understanding and agreement." (Exhibit 32 to Silverman Affidavit.) According to this letter, the parties "have agreed" to form a partnership if: (1) they obtain a $2.1 million construction loan; (2) $100,000 is paid to Miller Building Corp. to be used to pay down Atrium's loan from Peoples Bank, and (3) Miller and Ballantine are absolved of their personal liability on the Peoples note. Silverman has submitted documents tending to show that the first and third conditions were met, and that satisfaction of the second was frustrated by the defendants' malfeasance.

It is undisputed that on April 12, 1990, Silverman, Miller, Ballantine, and Forrest received a commitment letter from BB & T offering them up to $2.1 million in financing for the Chloride project. (Exhibit 40 to Silverman Affidavit.) Then, on May 2, 1990, a representative of Peoples Bank agreed to restructure the Peoples Bank note and void the personal guarantees of Miller and Ballantine. These documents indicate that the first and third conditions were performed.

As to the second condition, Silverman alleges that Forrest was willing and able to pay $100,000 to join a fairly presented partnership, but refused after the defendants failed to propose a partnership in good faith. To support this contention, he points to the May 31, 1990 letter in which Forrest declined to participate in the partnership. (Exhibit 64 to Silverman Affidavit.) In this letter, Forrest refused to participate because he would be required to make a substantial investment in a partnership designed entirely for Miller's benefit.

The defendants have countered by submitting Forrest's affidavit in support of their motion. In his affidavit, Forrest states that his decision to back out of the

partnership was based on the low projected return on his investment, as well as his review of the proposed documents. (Affidavit of Forrest at 4.) Forrest also states that the April 5, 1990 letter was drafted by Silverman, although he concedes that he signed it. (*Id.* at 6.) Finally, Forrest indicates that the parties entered into an agreement "in April and May of 1990," and gives a somewhat different emphasis to the terms of that agreement. (*Id.* at 3–4.)

On balance, the court finds that these submissions create genuine issues of material fact as to whether the parties entered into an executory contract on April 5, 1990, whether the conditions attached to this agreement were satisfied, and as to whether this contract was breached when defendants Miller and Ballantine refused to enter into a reasonable partnership agreement with plaintiff and Forrest. Although Forrest's affidavit gives a somewhat different version of events than Silverman's, it does not conclusively resolve any of the factual disputes. Accordingly, the defendants' motion for summary judgment must be DENIED as to this claim.

### 5. Breach of Corporate Opportunity Doctrine

■ Plaintiff next claims that defendants Miller and Ballantine improperly usurped the Chloride deal from Atrium and diverted it to Miller Building Corporation, a separate entity in which each held a substantial interest. He alleges that he has previously demanded that Miller and Ballantine, as officers, directors, and majority shareholders of Atrium, bring an action on the corporation's behalf for these acts. He claims that this action died for lack of a second, and that any additional demand upon the corporation or these defendants would be futile.

As in earlier claims, plaintiff asks that the procedural requirements concerning derivative actions be excused so that the court might make a fair distribution of the proceeds of this claim. However, as discussed above, there is no indication that any proceeds of the derivative claim, which plaintiff is pursuing in the alternative,

would not be fairly distributed. For this reason, the defendants' motion for summary judgment is GRANTED as to this claim.

### 6. Conversion

The sixth claim for relief alleges that the defendants' usurpation of the Chloride deal constitutes the conversion of corporate property. Once again, plaintiff recognizes that this claim should properly be brought as a derivative action, but asks the court to excuse this requirement so that a fair distribution of the proceeds might be achieved. For the reasons given above, the defendants are GRANTED summary judgment on this claim.

### 7. Shareholder Derivative Action

In the alternative, plaintiff brings claims 2–6 derivatively on behalf of Atrium with the corporation named as a nominal defendant. In support of his derivative claims, Silverman alleges that he is a shareholder of Atrium, that he has previously demanded that Miller and Ballantine bring an action on behalf of the corporation based on these allegations, and that any further demand would be futile.

■ Silverman has submitted the minutes of the July 5, 1990 meeting of the Atrium board of directors as part of exhibit 84 to his affidavit. These minutes confirm that Silverman made a motion that Atrium retain counsel to investigate the usurpation of the Chloride deal, and that this motion died for lack of a second. The court agrees with Silverman that this action satisfies the demand requirement of N.C.Gen.Stat. § 55–7–40, and that any further demand would have been futile. *See Loy v. Lorm Corp.*, 52 N.C.App. 428, 278 S.E.2d 897 (1981). (Demand requirement excused when defendants constitute majority of board of directors.) It follows that Silverman may bring claims 2–6 derivatively on behalf of Atrium.

#### a. Second Claim

■ As discussed above, the second claim for relief alleges that defendants Miller and Ballantine breached their fiduciary

duty to Atrium by diverting the Chloride deal from Atrium to MBC. In response to defendants' motion for summary judgment, Silverman has produced his own affidavit and several documents to support this claim.

Silverman's submissions indicate that Atrium was originally named as the lessor on early drafts of the Chloride lease, and remained in this role until April 5, 1990. This fact is confirmed in several affidavits submitted by the defendants. In particular, James J. Kaufman, the attorney retained to draft the lease, confirms that he inserted Atrium as the lessor in early drafts. (Affidavit of Kaufman at 3.) There is also evidence that Silverman, in his capacity as president of Atrium, performed services to secure the Chloride deal. This activity indicates that Atrium held an interest in this deal.

To counter Silverman's evidence, the defendants have produced numerous affidavits presenting an entirely different version of the transaction. The defendants' submissions indicate that Silverman and Atrium were minor players who had no significant role in negotiating the Chloride deal. Furthermore, these affidavits consistently indicate that Miller and Ballantine involved Silverman in the Chloride project only to extricate themselves from Atrium and their personal guarantees of its debt. Finally, the defendants have submitted evidence tending to show that the Chloride lease was never an asset of Atrium Development Corporation, and that the name of the lessor was insignificant to the parties.

It has long been held that corporate directors and officers owe duties of good faith, due care, and loyalty to the corporations they manage. *See, e.g., Brite v. Penny,* 157 N.C. 110, 72 S.E. 964 (1911); *Hauser v. Tate,* 85 N.C. 81 (1881). This rule is presently codified in the North Carolina General Statutes at § 55–8–30, which expressly requires that a director act in the best interest of his corporation. Numerous cases have held that this duty is breached if a director appropriates a corporate opportunity or asset for personal gain. *See, e.g., Meiselman v. Meiselman, supra;*

*Brite v. Penny, supra;* and *Loy v. Lorm Corp., supra.*

The defendants have submitted a number of affidavits tending to substantiate their version of the facts. However, plaintiff has responded with evidence which, if believed, would enable a jury to find in the corporation's favor. Considered together, the parties' submissions create a genuine issue of material fact as to whether defendants Miller and Ballantine breached their duty of loyalty by diverting the Chloride deal from Atrium to MBC. Accordingly, the defendants' motion for summary judgment is DENIED as to this claim.

### b. *Third Claim*

 Considered as a derivative action, the third claim for relief alleges that the defendants breached their fiduciary duty to Atrium by failing to act in good faith when structuring the Stag Park Properties partnership. The court has previously found, and Silverman's own submissions make clear, that the Stag Park Properties partnership was offered to Silverman individually, and was never offered to or connected with Atrium.

Because Atrium had no expectancy of benefit from Stag Park Properties, the court finds that the fiduciary duty created by the defendants' positions within the corporation imposed no fiduciary obligation within the context of an entirely separate business venture. Accordingly, the defendants' motion for summary judgment is GRANTED as to this claim.

### c. *Fourth Claim*

 The fourth claim for relief seeks damages for breach of an executory contract which was allegedly formed on April 5, 1990 between Silverman, Forrest, Miller, and Ballantine. There is no allegation that Atrium was a party to this contract or that Atrium was harmed by its breach. Accordingly, Atrium has no standing to pursue this claim, and the defendants' motion for summary judgment is GRANTED as to it.

### d. *Fifth Claim*

 The fifth claim for relief alleges that Miller and Ballantine usurped the

Chloride deal from Atrium and diverted it to Miller Building Corporation, an entity in which they (but not Silverman) held a substantial interest. This claim is based on the corporate opportunity doctrine recognized by the North Carolina Supreme Court in *Meiselman v. Meiselman.*

■ The corporate opportunity doctrine arises from the duties of good faith and loyalty, and holds that a director or officer cannot divert opportunities which belong to his corporation.

[A] corporate director or officer will be deemed to have appropriated for him or herself an opportunity rightfully belonging to the corporation [i]f there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself.

*Meiselman v. Meiselman,* 309 N.C. 279, 311, 307 S.E.2d 551, 569–70 *quoting Guth v. Loft, Inc.,* 23 Del.Ch. 255, 272–73, 5 A.2d 503, 511 (1939).

■ When a fiduciary is charged with having usurped a corporate opportunity, he or she bears the burden of establishing that the transaction "in which he or she has engaged is 'just and reasonable' to the corporation because it was not an opportunity or 'corporate transaction' which the corporation itself would have wanted." *Id.,* 309 N.C. at 310, 307 S.E.2d 551. In making this determination, a trial court must examine two factors: (1) is the opportunity functionally related to the corporation's business, and (2) did the corporation hold an interest or expectancy in the opportunity. *Id.*

The factual disputes underlying this claim are virtually identical to those relating to the claim for breach of fiduciary duty based on usurpation of the lease.

And, as above, the court's review of the record reveals evidence from which a fact-finder could conclude that the Chloride lease was functionally related to Atrium's business and that Atrium held an interest in this opportunity. It is undisputed that the benefits of this opportunity went to MBC and to Stag Park Properties, that Miller and Ballantine benefitted from those entities, and that Miller and Ballantine were officers and directors of Atrium when that corporation lost its interest in the Chloride lease. Accordingly, the defendants' motion for summary judgment is DENIED as to this claim.

#### e. *Sixth Claim*

■ In this claim, plaintiff asserts that the usurpation of the Chloride deal by the defendants amounts to an improper conversion of corporate property. Because Atrium's interest in the Chloride deal is not a type of property subject to conversion, the court finds that this claim fails as a matter of law.

■ Conversion "is defined as 'an unauthorized assumption and exercise of the right of ownership over *goods* or *personal chattels* belonging to another, to the alteration of their condition or the exclusion of an owner's rights.' " *McNeill v. Minter,* 12 N.C.App. 144, 145, 182 S.E.2d 647, 647–8 (1971) (emphasis in original). North Carolina's courts have consistently held that only goods and personal chattels are subject to conversion. *Gallimore v. Sink,* 27 N.C.App. 65, 218 S.E.2d 181 (1975); *Wall v. Colvard, Inc.,* 268 N.C. 43, 149 S.E.2d 559 (1966).

Here, plaintiff alleges that the defendants converted Atrium's interest in the "Chloride deal." The parties' submissions indicate that Atrium's interest consisted of its expectation of two possible benefits. First, there is evidence that Atrium expected to be named as lessor on the Chloride lease. Second, there is evidence indicating that Atrium had an expectancy that it would be the developer of the Chloride project.

There is no indication that either of these expectancies ever became a personal chat-

tel, or even an enforceable contract right. It follows that Atrium's interest in the Chloride deal is not subject to conversion under North Carolina law. Accordingly, defendants' motion for summary judgment is GRANTED as to this claim.

### 8. Action for Accounting

■ Plaintiff's eighth cause of action asks for an accounting "of all sums received by the Defendants from the Chloride deal, since the execution of the Lease in May 1990 and to have and recover all sums due the Plaintiff by reason of said accounting." (Complaint at 14–15.) For the reasons given below, the defendants' motion for summary judgment is GRANTED as to this claim.

North Carolina law provides that "any partner" has the right to demand a formal account of partnership affairs if "he is wrongfully excluded from the partnership business or the possession of its property by his copartners." N.C.Gen.Stat. § 59–52. The right to an accounting is based on the fiduciary obligations which obtain between partners, entitling each "to know all that the others know...." *Casey v. Grantham*, 239 N.C. 121, 124–25, 79 S.E.2d 735, 737 (1954).

Here, it is undisputed that Silverman never became a partner in Stag Park Properties. Furthermore, the court has found that he did not stand in a fiduciary relation to Miller and Ballantine with respect to the formation of this partnership. Accordingly, Silverman has no right to demand an accounting from Miller and Ballantine.

### 9. Unfair or Deceptive Trade Practice

■ Plaintiff's tenth claim for relief alleges that the defendants' conduct constitutes an unfair or deceptive trade practice in violation of N.C.Gen.Stat. § 75–1.1. This statute provides that:

[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful.

N.C.Gen.Stat. § 75–1.1(a). To succeed under this statute, plaintiff must establish that the defendants' actions were unfair or deceptive, affected commerce, and caused him actual injury.

An act is considered "unfair" for purposes of § 75–1.1 "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Johnson v. Phoenix Mutual Life Insurance Co.*, 300 N.C. 247, 263, 266 S.E.2d 610, 621 (1980), *rev'd on other grounds by Myers & Chapman, Inc. v. Thomas G. Evans, Inc.*, 323 N.C. 559, 374 S.E.2d 385 (1988). In a more recent case, the North Carolina Supreme Court held that an unfair act or practice occurs when "a party engages in conduct that results in an inequitable assertion of his power or position." *Johnson v. Beverly–Hanks & Associates*, 328 N.C. 202, 208, 400 S.E.2d 38, 42 (1991). However, there is no requirement that a defendant act with bad faith or engage in intentional wrongdoing. *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981).

■ Section 75–1.1 does not apply to every transaction that might be viewed as unfair or deceptive. Rather, it applies only if the alleged violator is engaged in "commerce," a term defined to include "all business activities, however denominated." N.C.Gen.Stat. § 75–1.1(b). *See Bhatti v. Buckland*, 328 N.C. 240, 400 S.E.2d 440 (1991); *HAJMM v. House of Raeford Farms*, 328 N.C. 578, 403 S.E.2d 483 (1991).

Plaintiff has submitted evidence indicating that on February 22, 1990, he was asked to assume lease negotiations with the Chloride Group. He contends that he thereafter negotiated the lease, obtained financing, and arranged for a building site. His submissions indicate that he initially performed these services with the expectation that he and Atrium would participate in the profits of the deal.

He alleges that when, on April 5, 1990, it became clear that Atrium would receive no benefit from the deal, he was induced to continue working on the project by the defendants' promise that he would be a principal in a partnership which would be formed to hold the beneficial interest of the

**380**

lease. He asserts that he satisfied every condition necessary to become a partner in this venture, yet was excluded by the defendants' failure to propose a partnership agreement in good faith.

The parties' submissions leave little doubt that the defendants were engaged in commerce when obtaining and structuring the Chloride deal. And, although the defendants sharply dispute plaintiff's version of events, the court finds that he has submitted sufficient documentary evidence to create genuine issues of material fact as to whether the defendants's actions were unfair or deceptive, and as to whether he was injured by these actions. Accordingly, the defendants' motion for summary judgment is DENIED as to this claim.

### 10. Punitive Damages

■ In his ninth claim for relief, plaintiff alleges that the defendants' actions were done with "careless and reckless disregard to the rights of the Plaintiff, in bad faith, and were done with the express intent to cause substantial financial harm to the Plaintiff," thereby entitling him to an award of punitive damages. (Complaint at 15.)

■ The North Carolina Court of Appeals has held that punitive damages are not available for violations of N.C.Gen.Stat. § 75-1.1. See Pinehurst, Inc. v. O'Leary Bros. Realty, 79 N.C.App. 51, 338 S.E.2d 918 (1986); Process Components, Inc. v. Baltimore Aircoil Co., 89 N.C.App. 649, 366 S.E.2d 907 (1988). Neither are punitive damages available for a simple breach of contract. See, e.g., Stan D. Bowles Distributing Co. v. Pabst Brewing Co., 69 N.C.App. 341, 317 S.E.2d 684 (1984). However, punitive damages are available, without further proof of aggravation, when corporate directors breach their fiduciary duty to their corporation. Stone v. Martin, 85 N.C.App. 410, 355 S.E.2d 255 (1987).

Here, Silverman's remaining individual claims are for quantum meruit, breach of contract and unfair and deceptive trade practices. Because these claims will not support an award of punitive damages, the defendants' motion for summary judgment

is GRANTED as to these claims. However, punitive damages may be available for the claims brought derivatively on behalf of Atrium, and defendants' motion is DENIED as to these claims.

### IV. Cross–Motions for Summary Judgment on Counterclaims

Plaintiff has filed two motions seeking summary judgment on the two counterclaims filed separately by Atrium and by Miller, Ballantine, and MBC. Miller, Ballantine, and MBC have cross-moved for summary judgment as to their counterclaim.

### A. Atrium's Counterclaim

■ Atrium's counterclaim alleges that Silverman expended corporate funds without the authorization of the board of directors, and negligently failed to terminate two real estate contracts. Plaintiff's motion for summary judgment against Atrium was filed on January 15, 1993. The court's record does not indicate that plaintiff has filed a memorandum in support of this motion, nor does it show any response filed by Atrium.

The court notes that Atrium's counsel was permitted to withdraw on October 1, 1992 and, that Atrium is apparently unrepresented at present. In this circumstance, the court is unwilling to grant summary judgment based solely on plaintiff's unsupported motion. Accordingly, plaintiff's motion is DENIED at this time. However, Atrium is cautioned that its counterclaim will be dismissed sua sponte for failure to prosecute if Atrium has not retained counsel by the time of the pre-trial conference.

### B. Counterclaims of Miller, Ballantine, and MBC

Miller, Ballantine, and MBC have filed two counterclaims against Silverman. MBC's counterclaim seeks $4,028.84 for health and disability insurance it provided to Atrium employees. Miller and Ballantine bring the second counterclaim to recover $51,818.26 for furniture lease payments they assumed after Silverman refused to

pay them.[8] Both plaintiff and the defendants have moved for summary judgment on these counterclaims.

### a. *Furniture Lease*

██ Miller and Ballantine allege that Atrium contracted with Executive Leasing for the lease of office furniture and equipment. Silverman, Miller, and Ballantine personally guaranteed the lease payments. When Atrium became unable to meet these payments, "Silverman agreed to take the furniture and equipment and to pay the remaining lease payments. However, after only a few months, Silverman failed and refused to pay the remaining lease payments." (Answer and Counterclaims at 9.) Miller and Ballantine claim that after Silverman's default, they were required to make lease payments of $51,818.26. Their counterclaim seeks recovery of these costs.

At oral argument, plaintiff's counsel conceded the existence of genuine issues of material fact pertaining to this counterclaim. The court agrees that there are unresolved issues as to whether or not Silverman entered into an enforceable agreement to assume the furniture lease payments. Accordingly, the cross-motions for summary judgment are DENIED as to this counterclaim.

### b. *Insurance Payments*

██ The remaining counterclaim, which is brought only by MBC, alleges that:

1. At the special instance of SILVERMAN, MILLER BUILDING covered employees of ATRIUM DEVELOPMENT CORPORATION with group, health, disability, and life insurance at a cost of $4,028.84.

2. Because SILVERMAN squandered the funds at Atrium and spent same without authorization, Atrium was unable to pay the costs incurred for the insurance coverage.

3. Silverman and Atrium are jointly and severally liable to MILLER BUILDING in the sum of $4,028.84 together with interest from 29 May 1990.

(Answer and Counterclaims at 9.)

Plaintiff contends that he is entitled to summary judgment on this claim because *he* did not contract with MBC to provide this coverage. He argues that MBC's contract was with Atrium only, and that MBC cannot maintain a claim against him individually. In addition, he asserts that MBC's only relationship with Atrium is as a creditor, and that this relationship does not give it standing to complain of Silverman's alleged mismanagement of the corporation.

The defendants have also moved for summary judgment on this counterclaim. Their memorandum, however, concedes that there may be a genuine issue of material fact as to whether Silverman or Atrium is obligated to reimburse MBC for the insurance costs.[9] The court agrees.

Although Silverman's affidavit states conclusively that only Atrium is bound to pay these costs, MBC has countered with affidavits indicating that Silverman may also be personally obligated. In particular, the affidavit of Ronald A. Moore, Manager of Administrative Services for MBC, states that *"Silverman agreed* that Miller Building would be paid all of the premiums incurred." (Affidavit of Moore at 2. Emphasis added.)

From this record, the court finds a genuine issue of material fact as to whether Silverman is liable for payment of these costs. Accordingly, the cross-motions for summary judgment are DENIED as to this counterclaim.

### V. *Cross-motions to Compel*

Because summary judgment has been granted on a number of plaintiff's claims,

---

**8.** Silverman has filed a third-party complaint asserting that Miller and Ballantine are jointly and severally liable for any damages resulting from his liability on Atrium's counterclaim.

**9.** In its memorandum, MBC argues that it remains entitled to summary judgment "on the issue of unjust enrichment in the amount of the insurance premiums actually received by Silver-

man." (Defendants' Memorandum at 51.) However, the court does not read the counterclaim as stating a claim for unjust enrichment and, finds nothing in defendant's counterclaim which requires it to treat payments made on Silverman's behalf differently from those made on behalf of other Atrium employees.

the court finds that a detailed examination of the motions to compel would be of little practical benefit. In the interest of judicial economy, both motions are DENIED, and each party is directed to reexamine his opponent's discovery responses in light of this order. The parties are then directed to confer to see if they can resolve any remaining discovery disputes without further court involvement. If disagreements remain, the motions may be renewed by filing a supplemental motion within 15 days identifying *specifically* which portions of the prior discovery responses remain in dispute, and their relevance to the issues remaining for trial.

### VI. *Conclusion*

Based upon the foregoing: (1) plaintiff's motion to compel and for sanctions is DENIED; (2) defendant Miller's motion to compel, for sanctions, and to tax costs is DENIED; (3) defendants' motion for summary judgment is GRANTED in part, and DENIED in part; (4) plaintiff's motion for summary judgment against Miller, Ballantine, and MBC is DENIED; (5) plaintiff's motion for summary judgment against Atrium Development Corporation is DENIED; (6) defendants' motion to exclude evidence and for sanctions is DENIED; and (7) defendants' motion to strike Silverman's affidavit is DENIED.

So Ordered.